Duncan **COOPER**, Dennis L. **Hoerr**, and **Valley Land & Cattle, Ltd.**, Appellants,

v.

David M. **FORTNEY** et al., Appellees.

No. B14–85–149–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 7, 1985.

Yii-Chwen Pan of Gibbions, Burrows & Bratton, Houston, for appellants.

Theodore F. Weiss, Jr., E.W. Barnett, Patrick Zummo of Baker & Botts, Robin C. Gibbs of Gibbs & Ratliff, J.M. Slator, III of Slator & Pendergast, Houston, for appellees.

Before PAUL PRESSLER, MURPHY and DRAUGHN, JJ.

OPINION

DRAUGHN, Justice.

In this legal malpractice suit, the trial court granted a summary judgment in favor of the defendant/attorney. The attorney had drafted a contract for the sale of lignite from a mine in Brewster County, Texas. The two basic summary judgment questions in this appeal are (1) whether the attorney drafted a contract that violated Texas antitrust laws; and (2) whether the attorney's actions in drafting that contract were not as a matter of law a cause of the plaintiff/client's damages for lost profits when a federal court held the contract void and unenforceable under the Texas statutes prohibiting the restraint of free trade. We find that the contract *did* violate the Texas Antitrust laws and that the summary judgment evidence was insufficient to establish as a matter of law that the attorney's conduct *did not* cause his client's alleged damages. We reverse the summary judgment, and remand the case for a trial on the merits.

This case arose out of the following facts: Appellants Duncan Cooper, Dennis Hoerr, and Valley Land & Cattle, Ltd. ("Valley") mine lignite in Brewster County. Valley contracted to sell lignite to Arnold & Clarke Chemical Company ("Arnold & Clarke"). Disagreements arose over the contract's terms, whereupon Valley sought legal counsel from the appellee, attorney David Fortney ("Fortney" or "the attorney"). Fortney renegotiated the terms of the contract with Arnold & Clarke and drafted a new document.

Shortly after executing the new contract, Valley and Arnold & Clarke again disagreed. When Arnold & Clarke defaulted, Valley sued in state district court, pleading three causes of action: breach of contract, fraud, and promissory estoppel. Arnold & Clarke countersued and removed the case to federal court. In the meantime, another attorney had informed Valley that the contract violated Texas antitrust laws. Arnold & Clarke agreed with this assessment and moved for a summary judgment on Val-

ley's breach-of-contract claim. When Valley did not oppose Arnold & Clarke's motion, the federal district judge granted a summary judgment on this issue, thus eliminating any claims for breach of contract from this federal suit. As a result of this action, Valley recovered a portion of its damages under theories of fraud and promissory estoppel but failed to recover its lost profits under the contract.

Valley subsequently filed this legal malpractice suit against Fortney in state district court. Valley sought to recover damages resulting from his negligence or omissions in negotiating and drafting the contract in question. Valley also asserted a claim under the Texas Deceptive Trade Practices Act for the attorney's misrepresentations concerning his professional ability and concerning the validity and effectiveness of the contract.

The attorney then moved for summary judgment, alleging (1) the contract did not violate Texas antitrust laws, and (2) even if the contract did violate such laws, the attorney's actions in drafting the contract were not the cause of Valley's damages. The state court granted the attorney's motion for summary judgment.

Our first task in this appeal is to determine whether the contract in question violated the Texas antitrust laws, TEX.BUS. & COM.CODE ANN. §§ 15.02, 15.03 and 15.04 (Vernon 1968). The contract (entitled "Purchase Order") contains, *inter alia,* provisions covering the amount of lignite to be sold, the manner in which the lignite is to be delivered, the price to be paid by Arnold & Clarke, quality specifications for the lignite, and an exclusive dealing arrangement between Valley and Arnold & Clarke.[1]

To decide whether this contract violated the antitrust laws, we must initially ascertain whether it is an output contract or an ordinary supply contract. An output contract measures the quantity to be sold by an amount equal to the seller's total good-faith output, although the contract may limit that amount to estimates of minimum and maximum production. An output contract requiring sale of the product exclusively to one buyer for a specific purpose is usually valid and not a violation of Texas antitrust laws. TEX.BUS. & COM.CODE ANN. § 2.306 comments 2, 3 (Vernon 1968); *Portland Gasoline Co. v. Superior Marketing Co.,* 150 Tex. 533, 243 S.W.2d 823 (1951); *Loeb v. Winnsboro Cotton Oil Co.,* 93 S.W. 515 (Tex.Civ.App.1906).

In contrast, an ordinary supply contract measures the quantity to be sold by stating a specific, fixed amount. Unlike an output contract, an ordinary supply contract requiring sale of the product exclusively to one buyer *may* violate the antitrust laws, depending upon the type and extent of the contract's trade restrictions. Therefore, if we conclude the contract before us is an ordinary supply contract, we must examine very closely any provisions that appear anticompetitive to determine whether the contract unduly restricts fair trade.

We conclude this contract is not an output contract but merely an ordinary supply contract. The contract basically contains two separate agreements: one primary and one ancillary agreement. The primary agreement states that Valley will sell a specific amount of lignite from the Brewster mine (65,280 tons) to Arnold & Clarke. The 65,280 tons is to be delivered at the *minimum rate* of 1,088 tons per month for 60 months (1,088 × 60 = 65,280). Nowhere does the contract indicate that Valley is to deliver the Brewster mine's *total output* for 60 months, nor does it state that 65,280 tons is an estimate of the Brewster mine's output for 60 months.

The estimate of "a minimum of 1,088 tons per month" (found in paragraph two entitled "Monthly Production, Processing and Delivery") is merely a term establishing the *rate of delivery* for the 65,280 tons and also refers to the fact that Arnold & Clarke at times would be accepting additional lignite under the ancillary agreement discussed below. Under the primary

---

**1.** The relevant portions of the contract may be found in the appendix to this opinion.

agreement, if Valley were to deliver substantially more than 1,088 tons per month, the contract's primary agreement apparently would terminate earlier than the projected term of 60 months, because Arnold & Clarke would have received the stated quantity (65,280 tons) before the 60-month deadline. If Valley were to deliver 65,280 tons within 50 months, for example, the contract does not require Arnold & Clarke to accept Valley's continued potential output of 1,088 tons per month for the ten months that would remain in the original 60-month term. Rather, Arnold & Clarke's obligation to accept lignite under the contract's primary agreement ends when it has received and paid for 65,280 tons, period.

We note that the contract also includes an ancillary agreement for the repayment of money loaned to Valley by Arnold & Clarke. At one point during its course of dealings with Arnold & Clarke, Valley borrowed money and executed a promissory note in the principal amount of $123,510.37. In the ancillary agreement, Valley promised to deliver to Arnold & Clarke, in addition to the primary quantity of 65,280 tons, another amount of lignite sufficient to pay off this note. The contract contains specific requirements as to the methods for stockpiling and delivering the lignite assigned to the repayment of this loan. However, this ancillary agreement is separate from the primary agreement to sell Arnold & Clarke 65,280 tons of lignite; like the primary agreement, however, it calls for the transfer of a specific amount of lignite to pay off the loan. This contract as a whole provides for the sale of a *fixed quantity* of lignite rather than for the sale of *Valley's good-faith output* over 60 months. Therefore, this contract is an ordinary supply contract.

We now turn to the contract's exclusive dealing provisions in paragraph ten entitled "Exclusive Purchaser." This paragraph includes the following arrangements:

(1) Valley may not sell lignite from *any property* in Brewster County to anyone in the oil and gas drilling fluid business except Arnold & Clarke.

(2) If Valley desires to pursue a market outside the oil and gas drilling fluid business, it must submit a detailed, written proposal to Arnold & Clarke and must request Arnold & Clarke's permission to sell lignite to purchasers in this market.

(3) Arnold & Clarke must decide within 180 days after receipt of such proposal *whether to buy additional lignite* from Valley for use in the proposed market. If Arnold & Clarke decides to purchase additional lignite for this purpose, Valley agrees not to pursue this market independently and agrees to increase production to satisfy Arnold & Clarke's requirements in supplying this market.

(4) If Arnold & Clarke explicitly elects not to pursue this market, or implicitly so elects by allowing the 180 days to elapse without communicating its decision, only then may Valley independently enter this market.

We must now decide whether these provisions, as contained in an ordinary supply contract, unduly restrain competition in contravention of the antitrust laws in effect from November of 1979 through January of 1980 when the attorney drafted the contract. TEX.BUS. & COM.CODE ANN. §§ 15.02, 15.03 and 15.04 (Vernon 1968).[2]

This court found an ordinary supply contract highly anticompetitive, void, and unenforceable in *Elray, Inc. v. Cathodic Protection Service*, 507 S.W.2d 570 (Tex.Civ. App.—Houston [14th Dist.] 1974, no writ). The *Elray* contract prohibited the seller from manufacturing a product for the buyer's competitors for five years. The Dallas Court of Appeals arrived at the same conclusion regarding this type of contract in *Graphilter Corp. v. Vinson*, 518 S.W.2d 952 (Tex.Civ.App.—Dallas 1975, writ ref'd

**2.** The Texas Legislature rewrote §§ 15.02, 15.03, and 15.04, among other antitrust provisions, effective August 29, 1983. TEX.BUS. & COM. CODE ANN. §§ 15.01–15.40 (Vernon Supp. 1985).

n.r.e.). The *Graphilter* contract expressly prohibited the buyer from competing with the seller in a certain market that required graphite ore. The court found the contract illegally restrained trade, because the buyer of personal property expressly agreed not to compete with the seller. The court declined to find the restraint reasonable as ancillary to a legitimate contract, and it refused to enforce the agreement.

■ Paragraph ten of the contract before us includes several illegal restraints similar to those in *Elray* and *Graphilter.* Fortney has consistently alleged that this contract is an output contract *limited to a single facility.* The contract's introductory paragraph (as reproduced in the appendix) supports at least part of Fortney's claim, that the contract is limited to a single facility, because it states that Valley will sell Arnold & Clarke lignite "from the ore body tested by ARNOLD & CLARKE in Brewster County, Texas, such ore body being located on, in and under that certain in (sic) 640 acres of land known as Section 242 (L.F. Buttnill Survey on HE & WT RR. Co. Survey) Block G–4, Brewster County, Texas...." Therefore, we agree that the contract is limited to a single mine or facility located at "Section 242 ... Block G–4" in Brewster County. However, the first portion of paragraph ten restricts Valley's ability to sell lignite from *any property* in Brewster County, not merely from that property known as "Section 242 ... Block G–4." Should Valley develop a lignite facility in some other part of Brewster County, the contract's wording would prohibit the company from selling the new mine's production to anyone in the oil and gas drilling fluid business other than Arnold & Clarke. Thus, the seller of personal property agreed not to sell to the buyer's competitors. Such result appears to be highly anticompetitive and a significant restraint on lignite trade.

We further find that the subsequent portions of paragraph ten severely limit Valley's pursuit of new lignite markets outside the drilling fluids business, because they require Valley to seek Arnold & Clarke's "permission" to pursue these markets. The contract effectively grants Arnold & Clarke the right to *prohibit* Valley's entry into new markets altogether, thus assuring Arnold & Clarke's ready access to these markets' demands for lignite, free from Valley's competition for business. This result also seems to be a significant restraint on competition.

Although we may be unfamiliar with many of the customs peculiar to the mining industry, the 180-day decision period granted Arnold & Clarke in paragraph ten also appears to inhibit free trade by potentially preventing Valley from responding promptly to another buyer's offer to purchase lignite. If at the end of the 180 days, Arnold & Clarke elects not to pursue the proposed new market, potential buyers from this market who had expressed interest in purchasing Valley's lignite may very well be lost to other lignite suppliers because of the six-month delay in Valley's response to their offer. This situation could also effectively proscribe Valley's participation in other markets.

We note that paragraph ten further supports our earlier conclusion that this contract is not an output contract. It states that Arnold & Clarke may elect *to purchase extra lignite* from the Brewster mine to pursue a new market, in addition to purchasing the quantities described in other sections of the contract. Valley agreed to increase production to satisfy Arnold & Clarke's requirements for any new venture. If this contract were an output contract limited to the Brewster mine, wherein Valley was obligated in good faith to produce as much as possible, how then could Arnold & Clarke arrange to buy a substantial *additional* quantity of lignite from this mine for a new market, over and above Valley's good-faith output?

Fortney attempts to answer this question by saying that although Valley was obligated in good faith to produce as much as possible, Arnold & Clarke was not subject to a corresponding duty to take and pay for all of Valley's output. Therefore, if Arnold & Clarke over the term of the contract took

less per month than Valley's good faith output, the remainder of the lignite produced would accumulate and provide Arnold & Clarke with a source of lignite for use in potential new markets, should it later elect to accept and pay for a greater quantity of the mineral to pursue such markets.

We find this argument disingenuous at best. While we have found no Texas case stating categorically that a buyer is *always* required to take and pay for the seller's total production in an output contract, the courts in several cases have indeed found the buyer obligated to accept and pay for the seller's total output. *Portland Gasoline*, 243 S.W.2d at 823; *Loeb*, 93 S.W. at 515. *See also Tennell v. Esteve Cotton Co.*, 546 S.W.2d 346, 358 (Tex.Civ.App.— Amarillo 1976, writ ref'd n.r.e.) (buyer *entitled* to seller's total output).

We believe an output contract requiring the seller in good faith to produce as much as possible for a single buyer also implies a corresponding duty that the buyer take and pay for that output. However, Valley and Arnold & Clarke did not contract for such an arrangement in this case. A reading of the contract as a whole reveals the companies contemplated an ordinary supply contract for 65,280 tons, plus sufficient tonage to pay off the note, plus additional tonage required for Arnold & Clarke to pursue any new markets it so desired, *in lieu of Valley's pursuit of such markets.*

We conclude this document, as an ordinary supply contract, violated the Texas antitrust laws by unfairly restraining free trade in lignite and by inhibiting open competition in this industry, contrary to the prohibitions of § 15.02, § 15.03, and § 15.04. We are not persuaded by the attorney's arguments that the contract's restraints are reasonable as ancillary limitations promoting legitimate business purposes. This contract intended to and does

in fact unduly restrain competition. We sustain Valley's first point of error.

We now address Valley's second point of error challenging the trial court's ruling. In seeking a summary judgment below, Fortney presented alternative allegations to the state court: (1) that the contract was valid and therefore could not have caused injury to Valley; or (2) if the contract was invalid, the attorney's actions in drafting the contract were not the cause of Valley's damages. Valley's second point of error challenges this second allegation.

We have already disposed of the first allegation by deciding the contract indeed was invalid and unenforceable for antitrust violations. In support of the alternative assertion, the attorney argues that Valley's "conscious decision to abandon" its breach-of-contract claim in federal court severed any causal connection between Fortney's conduct and Valley's failure to recover lost profits. In other words, the attorney alleges it was *Valley's* conduct that caused the damages, because Valley failed to oppose Arnold & Clarke's motion for summary judgment as to the breach-of-contract claim. Therefore, Fortney contends Valley's failure to recover lost profits was due to the company's election of remedies rather than to Fortney's actions in drafting an invalid contract. We disagree.

A contract that violates Texas antitrust laws is an illegal contract. *Elray*, 507 S.W.2d at 572. The courts will not enforce illegal agreements, and all parties to an illegal agreement are barred from any recovery based on that agreement.[3]

 The attorney claims Valley *elected* to abandon one remedy (breach of contract) in favor of other inconsistent remedies (fraud, promissory estoppel). However, this logic presupposes that Valley possessed a valid breach-of-contract claim in the first place. The Texas Supreme

---

**3.** *Patrizi v. McAninch,* 153 Tex. 389, 269 S.W.2d 343, 348–49 (1954); *Paragon Oil Syndicate v. Rhoades Drilling Co.,* 115 Tex. 149, 277 S.W. 1036, 1037 (Comm'n App.1925, opinion adopted); *Peniche v. Aeromexico,* 580 S.W.2d 152, 156 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ); *Cox Feedlots, Inc. v. T.V. Hope,* 498 S.W.2d 436, 438 (Tex.Civ.App.—San Antonio 1973, writ ref'd n.r.e.); *Vann v. Toby,* 260 S.W.2d 114, 118 (Tex.Civ.App.—Dallas 1953, writ ref'd n.r.e.).

Court has stated that a party effects no election of remedies by at first pursuing a remedy that proves unfounded and then pursuing one that is allowed. *Bocanegra v. Aetna Life Insurance Co.,* 605 S.W.2d 848, 852 (Tex.1980). The doctrine of election of remedies does not apply unless the party actually possesses "two valid and available remedies at the time he makes his election." *Poe v. Continental Oil & Cotton Co.,* 231 S.W. 717, 719 (Tex.Comm'n App.1921, holding approved).

█ The contract in question was void and unenforceable, offering no remedy to either party. Therefore, because Valley did not possess two valid remedies from which to choose, we find the company did not effect an *election* of remedies. We conclude that appellee's summary judgment evidence failed to establish as a matter of law that his conduct herein did not cause Valley's alleged damages for lost profits. We accordingly sustain Valley's second point of error, reverse the summary judgment, and remand this case to the trial court for a trial on the merits.

### APPENDIX

Valley agrees to produce and sell to ARNOLD & CLARKE and ARNOLD & CLARKE agrees to order and take from VALLEY and pay for 65,280 tons of humus lignite (sometimes called "leonardite") (hereinafter called the "PRODUCT") from the ore body tested by ARNOLD & CLARKE in Brewster County, Texas, such ore body being located on, in and under that certain in (sic) 640 acres of land known as Section 242 (L.F. Buttnill Survey on HE & WT RR Co. Survey) Block G–4, Brewster County, Texas, which land is covered by that one certain coal, lignite, and associated carbonaceous shale mineral lease owned by VALLEY dated July 30, 1977, a copy of which is recorded in Volume 203, Page 51, Deed Records of Brewster County, Texas; such PRODUCT to be produced and sold by VALLEY and ordered, taken and paid for by ARNOLD & CLARKE at the rate of 1,088 tons during each calendar month during the term of this agreement, subject to the further terms and provisions hereof; and VALLEY also agrees to produce and deliver to ARNOLD & CLARKE in accordance with the terms of that one certain promissory note of even date herewith, in the principal amount of One Hundred Twenty-Three Thousand Five Hundred Ten and 37/100 Dollars ($123,510.37) executed by VALLEY and payable to the order of ARNOLD & CLARKE (the "Note"), an amount of PRODUCT of sufficient value as stipulated in said Note to pay and discharge the indebtedness evidenced by said Note; all according to the further terms, conditions and limitations, set out hereinafter.

1. TERM:

The term of this agreement shall commence on February 1, 1980, and shall continue for the next succeeding sixty (60) calendar months, thereby terminating on January 31, 1985.

2. MONTHLY PRODUCTION, PROCESSING AND DELIVERY:

VALLEY will mine, mill, bag in fifty (50) pound bags and (as and when ordered pursuant to paragraph 3 hereof) deliver to ARNOLD & CLARKE, F.O.B. Alpine, Texas, a minimum of 1,088 tons of the PRODUCT, meeting the specifications set out hereinafter, during each calendar month throughout the term hereof ....

8. ADDITIONAL PRODUCT REQUIRED:

Notwithstanding anything herein to the contrary, on or before February 1, 1980, VALLEY must have mined, stockpiled and set aside upon the above described land an amount of crude mined lignite which, if processed and bagged into fifty (50) pound bags of lignite meeting the Specifications set out hereinabove, would have a total value of One Hundred Twenty-Three Thousand Five Hundred Ten and 37/100 Dollars ($123,510.37), calculated at a per ton value of $39.50 F.O.B. Alpine, Texas, (such lignite so stockpiled and set aside is hereinafter referred to as the "STOCKPILED

PRODUCT") and failure to fulfil the condition stated in this sentence shall thereupon, at VALLEY's option, cause this agreement to become null, void, and of no further force or effect.

10. EXCLUSIVE PURCHASER:

VALLEY agrees that it may not sell any of the PRODUCT produced from any property owned by it or produced under and by virtue of any lease owned by it in Brewster County, Texas, to anyone in the oil and gas drilling fluid business except ARNOLD & CLARKE. The parties hereto further agree that VALLEY will not sell any of such PRODUCT to any other purchaser for use in another type market without first presenting to ARNOLD & CLARKE a detailed written proposal with respect to the nature and scope of the other type market into which VALLEY desires to sell such PRODUCT. During the one hundred eighty (180) day period following ARNOLD & CLARKE's receipt of such written proposal, VALLEY shall be required to continuously supplement such written proposal, as and when additional pertinent information is obtained, by furnishing to ARNOLD & CLARKE written statements of all such additional information, including the terms and provisions of any PRODUCT purchase proposals received with respect to such other type market, and the identities of the potential purchasers. ARNOLD & CLARKE shall have 180 days from the receipt of such initial written proposal within which to elect in writing whether it will purchase additional amounts of PRODUCT for the purpose of utilizing same in such proposed market. If ARNOLD & CLARKE so elects, VALLEY agrees that it shall not sell PRODUCT to anyone, other than ARNOLD & CLARKE, for use in such other type market; ARNOLD & CLARKE agrees that it shall use all due diligence to begin operating in and developing such other market; and VALLEY obligates itself to use best efforts to increase production and delivery of the PRODUCT to an extent sufficient to satisfy the requirements of ARNOLD & CLARKE for use in such market. All PRODUCT so purchased by ARNOLD & CLARKE for use in such market shall be sold by VALLEY and purchased by ARNOLD & CLARKE pursuant to the terms and provisions of this agreement. If ARNOLD & CLARKE: (a) elects not to operate in such other market or (b) fails to make any election within the allotted 180 day period, VALLEY shall thereupon be free to sell PRODUCT to any purchaser of its choice for use in such type of market....