USX CORPORATION and Aristech
Chemical Corporation, Appellants,

v.

UNION PACIFIC RESOURCES
COMPANY, Appellee.

No. 2–87–186–CV.

Court of Appeals of Texas,
Fort Worth.

July 26, 1988.

Thompson & Knight, David M. Kendall and Alexandra W. Albright, Austin, Brown, Herman, Scott, Dean & Miles, Beale Dean and John W. Proctor, Fort Worth, Mark G. Yudof, Austin, for appellants.

Cantey & Hanger, Cecil E. Munn, Ralph H. Duggins, David C. Bakutis, Fort Worth, for appellee.

Before FENDER, C.J., and FARRIS and LATTIMORE, JJ.

## OPINION

FENDER, Chief Justice.

Appellee and plaintiff below, Union Pacific Resources Company, sued appellant, USX Corporation, for a breach of contract. After a jury trial, the trial court entered a judgment on the verdict awarding appellee $9,000,000.00 together with attorneys' fees, post-judgment interest, and prejudgment interest at the rate of 10% per annum compounded daily.

We affirm in part and reverse and remand in part.

We find it necessary to clarify the names of the parties to this appeal. Appellee, Union Pacific Resources Company, was, until May 1987, named Champlin Petroleum Company and is referred to as "Champlin"

throughout the trial record and our opinion. Appellant USX Corporation was, until July 1986, named United States Steel Corporation and is referred to as "USX" in the trial record and in our opinion. Appellant Aristech Chemical Corporation purchased the assets of USX's chemical division and assumed USX's breach of contract liability in the case at bar.

In 1977, Champlin considered building a plant near Corpus Christi, Texas, for the production of cumene, a chemical compound composed of benzene and propylene. On January 26, 1978, G.E. signed a cumene contract with Champlin agreeing to purchase a minimum of 200 million pounds and a maximum of 275 million pounds of cumene per year. This contract was unrelated to the USX contract, but is relevant to questions raised regarding the fair market price of cumene. On July 26, 1979, shortly after plant construction had begun, Champlin entered a contract with USX for the purchase of a minimum of 75 million pounds and a maximum of 125 million pounds of cumene per year to be delivered by Champlin at its refinery dock in Corpus Christi, Texas, to a barge supplied by USX. The commencement date of the contract was the date commercial production of cumene from the plant was estimated to begin, March 1, 1980. The term of the contract was to continue through December 31, 1984. The first installment period was to begin on the commencement date and end on June 30, 1980. Subsequent installment periods were contemplated to be consecutive six-month periods.

The contract had an open price term[1] that provided for a contract price that would be "the prevailing price in cents per pound, FOB Gulf Coast." The contract further provided:

> Contract Price determined for any period of time within the term of this contract shall be effective as of the beginning of such period. Each such determination shall be made, *if possible,* prior to the beginning of the period of time concerned, but deliveries shall not be interrupted because of delayed determination and, pending such determination, deliveries shall be conditionally billed and paid for at the price proposed by CHAMPLIN. [Emphasis added.]

The contract also contained a price dispute resolution clause. If USX disagreed with the price determined by Champlin, then the prevailing price determined under another Champlin contract which sold at least 50 million pounds of cumene per year to a third party would be binding on Champlin and USX.

Although there are numerous events contained in the voluminous records of evidence leading up to Champlin's eventual cancellation of the contract, we will only attempt to briefly summarize a few of those events.

On February 26, 1980, Champlin wrote USX stating the initial cumene production was set for March 15, 1980, and the net price to USX for the first installment period would be $.280/lb. with a transportation allowance of $.005/lb. A few days later, USX's representatives, Windfelder and Haggard, and Champlin's representative, Schepens, met to discuss the price presented in the February 26 letter. Windfelder informed Schepens that he did not feel that the 28 cent price was the prevailing price, and that USX was currently purchasing cumene for 26½ cents per pound. On March 24, 1980, Champlin sent a telex to USX informing it that Champlin would have cumene available for delivery to USX beginning April 1, 1980. There was no performance by USX.

On April 22, 1980, Champlin sent another letter to USX emphasizing it was "important that shipments of cumene begin without further delay," and Champlin presented "a conditional billing price of $.27/lb. F.O.B. Corpus Christi." A week later, Windfelder and Schepens met again to discuss the price of cumene under the con-

---

1. TEX.BUS. & COM.CODE ANN. sec. 2.305 (Tex. UCC) (Vernon 1968) defines "Open Price Term" in the following manner:

(a) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery....

tract. During this meeting an agreement was reached whereby USX would purchase 18 million pounds of cumene in May and June at 26¾ cents per pound and an additional 9 million pounds through a processing arrangement[2] during that same period. Still, in the months to follow there was no performance by USX.

On June 16, 1980, Schepens wrote to Haggard requesting, "your nomination[3] for the volume of cumene to be lifted from Champlin in the second half of 1980. Please telex or send me a letter with this information no later then [sic] June 20, 1980." Since USX did not reply by June 20, 1980, Champlin made a follow-up telephone call. In talking to USX's representative, James O. Smith, Champlin indicated that if USX's breach of the contract continued, the contract would be cancelled.

Subsequently, on July 3, 1980, Schepens met with Haggard to discuss Champlin's cancellation decision. No performance by USX followed this meeting. As a result, on July 11, 1980, a written confirmation of the cancellation was sent by Champlin to USX.

We will address USX's eighteen points of error in a logical order for our disposition of the case, which at times will not be the order submitted by the briefs. We must first determine whether USX breached the cumene contract and, if so, whether Champlin obtained the necessary finding that it was a lost volume seller before addressing the issue of damages.

USX's first two points of error assert that Champlin did not prove or obtain the necessary finding that it was a "lost volume" seller entitled to damages measured by lost profits pursuant to TEX.BUS. & COM.CODE ANN. sec. 2.708(b) (Tex. UCC) (Vernon Supp.1988). More specifically, USX claims neither special issues 7 and 7A, nor the charge, properly submitted the question of whether Champlin was a lost volume seller. Special issues 7 and 7A read as follows:

ISSUE NO. 7

Do you find from a preponderance of the evidence that during the term of the cumene contract Champlin was capable of producing more cumene than it sold to customers other than United States Steel?

Answer: "We do," or "We do not."

ANSWER: __We do__ .

. . . .

ISSUE NO. 7A

What sum of money, if any, do you find from the preponderance of the evidence, if paid to Champlin in cash, without interest, would be sufficient to put Champlin in as good a position as if United States Steel had fully performed the contract by purchasing the minimum volume from April 1980 through December 31, 1984?

. . . .

Answer in dollars and cents, if any.

ANSWER: __Nine million dollars__
__$9,000,000.00__

TEX.BUS. & COM.CODE ANN. sec. 2.708(b) provides an aggrieved seller with a profit formula alternative for remedial damage. The formula provides for the following calculation:

> Profit (including reasonable over-
> head)
> + Incidental damages
> + Costs reasonably incurred
> − Payments or proceeds of resale
> _____
> = Total damages under section
> 2.708(2)

The profit formula applies to all sellers who are left with "lost volume" as a result of the buyer's breach, and to all sellers who properly discontinue, or fail to begin, manufacture of goods because of a buyer's breach. Anderson, *Damages for Sellers Under the Code's Profit Formula*, 40 SW. L.J. 1021, 1023–25 (1986). The latter of the two categories has been coined the "incomplete goods" seller, and Champlin in the instant case falls within its parameters.

---

**2.** A processing agreement is an arrangement by which a cumene user supplies raw materials to a manufacturer who produces cumene for a processing fee.

**3.** Nomination is a term used throughout the trial to refer to the determination and presentation of the prevailing contract price.

Champlin discontinued manufacturing cumene to meet USX's minimum purchase of 75 million pounds and maximum purchase of 125 million pounds of cumene per year, as set forth in the contract, because Champlin believed USX had breached the contract.

The gravamen of USX's argument is that Champlin failed to submit the proper issues, as set out by this court in *Malone v. Carl Kisabeth Co., Inc.*, 726 S.W.2d 188, 190 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.), to establish itself as a lost volume seller.

In *Malone*, Kisabeth, a seller of chairs, brought suit against the buyer, Malone, for breach of contract after the buyer refused to accept delivery of a portion of the order. This court held that no issue was submitted and none of the issues submitted was "necessarily referrable [sic] to Kisabeth's ground of recovery on the basis of it being a lost volume seller, in the sense that none of the issues would have given notice to [Malone] that Kisabeth had not waived its ground of recovery based on being a lost volume seller." *Id.* at 190–91. This court indicated that there should have been special issues asking: (1) whether the purchaser at resale would have been solicited by the seller had there been no breach; (2) whether the solicitation would have been successful; and (3) whether Kisabeth could have performed the additional contract.

■ Even though the special issues in the case at bar did not precisely trace the wording of the special issues suggested by this court in *Malone*, we find the issues submitted necessarily refer to appellee's recovery based on being an incomplete goods seller, thereby giving notice to USX that Champlin had not waived this ground of recovery.

Special issue 7 asked, in the words USX's own counsel used to explain it to the jury, "whether Champlin could have in addition to supplying all the customers that they actually did supply, [and] the sales that they actually made ... supplied all of the minimum contract requirements to United States Steel under that contract, had the contract been fully performed by the par-

ties." Special issue 7 essentially asked the jury to find whether Champlin could have performed the additional contract. USX's counsel's rewording of the special issue in his explanation to the jury emphasized that USX recognized that Champlin was still attempting to recover under an incomplete goods seller theory.

After the jury determined Champlin had excess capacity by affirmatively answering special issue 7, special issue 7A asked the jury to determine the amount that would have been sufficient to put Champlin in as good a position as if USX had fully performed the contract.

The court's instruction following special issue 7A clearly sets forth the elements to be used in calculating the amount necessary to put Champlin in a financial position equivalent to that in which it would have been if the contract had been performed.

The measure of damages is the *profit* which Champlin would have made from full performance by United States Steel and includes any *incidental damages* also incurred.

....

You are not to include any amount for damages, if any, which Champlin could have avoided by exercising reasonable diligence to sell any available cumene. [Emphasis added.]

The first paragraph of the instruction incorporated the profit and incidental damages elements contained in the profit formula of TEX.BUS. & COM.CODE ANN. sec. 2.708(b). The latter paragraph corresponds to the mitigation of damages or the "due credit for payments or proceeds of resale" element.

Implied in the jury finding calculating the amount to answer special issue 7A was a determination that Champlin would have solicited G.E. and the other purchasers of cumene regardless of USX's breach, thereby deciding how much excess capacity Champlin possessed.

We concede that it would have been preferable for the trial court to use the special issue language as set out in *Malone*. However, we conclude that when special issues

7, 7A, and the court's instruction are read together that Champlin has substantially met its burden of obtaining the finding that it was an incomplete goods seller. Accordingly, USX's points of error one and two are overruled.

In points of error four, five, six, seven, eight, and nine USX generally contends that Champlin was not justified in cancelling the contract. Points of error four and five challenge: (1) the factual and legal sufficiency of the evidence to support the jury answer to special issue 4; (2) the definition of substantial impairment contained in special issue 4; and (3) the instruction to the jury as to the law of substantial impairment of an installment contract as contained in special issue 4. Special issue 4 reads as follows:

ISSUE NO. 4

Do you find from a preponderance of the evidence that the refusals, if any, by United States Steel to accept any deliveries of cumene in April 1980, May 1980, or June 1980, or the notification, if any, by United States Steel that it would not accept any deliveries of cumene in July 1980, August 1980 or September 1980, substantially impaired the value of the whole contract.

You are instructed that whenever a default with respect to one or more installments substantially impairs the value of the whole contract, there is a breach of the whole contract.

Answer "We do" or "We do not."

ANSWER: We do

USX requested that the court submit its requested instruction 3 defining the phrase "substantially impairs the value of the whole contract." The trial court refused to submit this requested instruction.

In evaluating all of USX's "no evidence" points we are to consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. See *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex.1985). In contrast, in

reviewing USX's "insufficient evidence" points, we are required to consider all of the evidence in the case. See *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

It is undisputed that the contract in this case was an installment contract. The applicable statute is TEX.BUS. & COM.CODE ANN. sec. 2.612(a) and (c) (Tex.UCC) (Vernon 1968) which provides:

(a) An "installment contract" is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause "each delivery is a separate contract" or its equivalent.

. . . .

(c) Whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole.

*Id.*

Texas case law has uniformly held that the trial court has broad discretion in submitting definitions and instructions to the jury. *Martin v. Texaco, Inc.*, 726 F.2d 207 (5th Cir.1984); *Remuda Oil & Gas Co. v. Nobles*, 613 S.W.2d 312, 316 (Tex.Civ.App.—Fort Worth 1981, no writ). However, if a term used in the court's charge is a legal or technical term then it must be defined. *Hogenson v. Williams*, 542 S.W.2d 456, 460 (Tex.Civ.App.—Texarkana 1976, no writ). The charge given by the court in the case at bar was reasonably clear to enable the jurors to understand the phrase. Although "substantial impairment of the value" is defined in comment 3 to TEX.BUS. & COM.CODE ANN. sec. 2.610 (Tex.UCC) (Vernon 1968) [4] the statute itself does not define the term. Nevertheless, comment 3 does not define the term in a manner indicating the term was a legal expression with a meaning unknown to laymen.

Whether the repeated refusals by USX to accept cumene from Champlin "substantially impairs the value of the

---

4. Comment 3 defines substantial impairment as a situation in which "material inconvenience or injustice will result if the aggrieved party is forced to wait and receive an ultimate tender minus the part or aspect repudiated."

whole contract" is a question of fact to be decided by the jury. *See International Therapeutics, Inc. v. McGraw–Edison Co.*, 721 F.2d 488 (5th Cir.1983). Champlin's witnesses testified that the value of the entire USX contract was substantially impaired because while the contract was in force Champlin had to be prepared to supply cumene to USX even though USX was not performing, which would have prevented Champlin from selling its cumene to other customers. Champlin's general manager, Click, testified that cancelling the contract only as to the months USX had breached it while remaining bound by the contract as to the remaining period would create "an intolerable situation from the standpoint where we could not be in a situation of having 125 million pounds of cumene available for such time as they might want to take it in any one year.... Just financially impossible, very costly." Click further testified the breach of the contract for the first six months impaired the value of the entire contract. Additionally, Morrison, Champlin's former in-house counsel, testified that a breach of the contract by failure to take during the first pricing period combined with the notice that the failure was going to continue during the second pricing period, impaired the value of the whole contract. There was also various testimony indicating USX had repeatedly refused to honor its commitment to lift.

Clearly, there is some evidence of probative force to support the jury's finding of substantial impairment of the whole contract. Further, the record as a whole reflects sufficient evidence to support a substantial impairment to the value of the whole cumene contract. USX's points of error four and five are overruled.

USX's points of error six through nine generally complain about special issues 5, 6, and 6A. Specifically, USX contends that the trial court erred in: (1) failing to inquire as to whether Champlin had reason to feel insecure about future performance; (2) incompletely submitting the issue of adequate assurance of performance; (3) failing to properly define adequate assurance of performance; (4) rendering judgment based on the jury's answers to special issues 6 and 6A because the evidence was legally and factually insufficient to support such findings; and (5) failing to specify the time period of prospective performance about which special issue 6 inquired.

A second statutory basis for Champlin's cancellation of the contract is TEX.BUS. & COM.CODE ANN. sec. 2.609 (Tex.UCC) (Vernon 1968) which provides:

(a) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

(b) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

. . . .

(d) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

*Id.*

Answering issue 5, the jury found that Champlin between the months of April and June 1980 "had reason to feel insecure that United States Steel would not perform its obligations under the contract." The jury was instructed that "a seller to a sales contract has reason to feel insecure when it has been given reason to believe the buyer's performance has become uncertain or, when there have been repeated breaches of the contract by the buyer." The jury found in special issue 6 that Champlin "demanded in writing that United States Steel perform its obligations ... in May and June or the second half of 1980." In con-

nection with this issue, the jury was instructed: (1) "a contract for sales imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired"; and (2) "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of due performance." Lastly, in answering special issue 6A, the jury found that USX "failed to provide Champlin within a reasonable time (not to exceed 30 days) with an adequate assurance that United States Steel would perform its obligations."

As previously discussed, the trial court has broad discretion in submitting definitions and instructions to the jury. *See Olivares v. State*, 693 S.W.2d 486, 492 (Tex.App.—San Antonio 1985, writ dism'd) (per curiam). In the case at bar the wording of the charge and instruction substantially complied with the language actually used in TEX.BUS. & COM.CODE ANN. sec. 2.609(a) and (d). The code itself does not define what constitutes a demand for adequate assurance other than to mandate that it be in writing, as did the instruction. We cannot say that the wording to special issues 5, 6, and 6A were improper or incomplete so to prevent the jury from understanding the phrase "demand adequate assurance of due performance" or from understanding the parties' rights under TEX.BUS. & COM.CODE ANN. sec. 2.609.

The essence of USX's legal and factual sufficiency argument is that Champlin made no demand that USX give adequate assurance of performance. To meet the requirements of section 2.609, a demand for adequate assurance of performance must be in writing. *National Ropes, Inc. v. National Diving Service, Inc.*, 513 F.2d 53, 61 (5th Cir.1975). Under section 2.609 the suspension of the performance is not available until assurance has been demanded, and repudiation cannot occur unless the demanded assurances are not received. *Tennell v. Esteve Cotton Co.*, 546 S.W.2d 346, 354–55 (Tex.Civ.App.—Amarillo 1976, writ ref'd n.r.e.).

■ Letters from Champlin to USX demanding that USX perform the contract

were introduced into evidence. The first installment period ran from the contract's commencement date, March 1, 1980, through June 30, 1980. The second installment period ran from July 1 through December 31, 1980. On March 24, 1980, Champlin sent a telex to USX stating:

PER OUR CONVERSATION, CHAMPLIN WILL HAVE CUMENE AVAILABLE FOR DELIVERY TO USS CHEMICALS BEGINNING APRIL 1, 1980. CHAMPLIN WILL BE ABLE TO LOAD 10–20 M BBLS AT THAT TIME WITH AN ADDITIONAL VOLUME OF 10–20 M BBLS AVAILABLE BY APRIL 10. BILL COULSON (512) 882–8871) WILL SCHEDULE YOUR BARGES INTO THE DOCK.

There was no performance by USX nor a reply by USX to this telex. The record also indicates Champlin had previously sent a letter to USX on February 26, 1980, indicating a nomination price and the date of the initial production schedule.

Subsequently, on April 22, 1980, Champlin demanded in a written letter to Haggard that USX begin honoring its contract:

Even though price discussions are continuing in an effort to determine the "prevailing" second quarter market price, it is important that shipments of cumene *begin without further delay.*

. . . .

I am requesting that USS Chemicals contact Bill Coulson ... by the end of April with a lifting schedule for May and June. [Emphasis added.]

Because of USX's continued nonperformance, on June 16, 1980, Schepens again wrote Haggard stating:

Under provisions of our cumene contract, I am requesting your nomination for the volume of cumene to be lifted from Champlin in the second half of 1980. Please telex or *send me a letter* with this information no later then [sic] June 20, 1980. [Emphasis added.]

Champlin also sent USX a telex simultaneously with the mailing of the letter. There was no response from USX by the June 20th date.

The testimony of Schepens revealed that during a July 3, 1980 meeting between the parties, USX informed Champlin that it would not be nominating any volume for the third quarter. On July 11, 1980, Champlin sent a written confirmation of the cancellation of the contract to USX.

The Uniform Commercial Code should be liberally construed and a formalistic application has therefore been rejected. TEX. BUS. & COM.CODE ANN. sec. 1.102(a) (Tex.UCC) (Vernon 1968). What constitutes a demand for adequate performance is a question of fact and neither the code language nor the case law provides a definite answer. *See National Ropes, Inc.,* 513 F.2d at 61 (a written request for accelerated payment for payment not yet due for a shipment was not a demand for adequate assurance); *National Farmers Org'n v. Bartlett & Co., Grain,* 560 F.2d 1350, 1353–55 (8th Cir.1977) (notification by seller of no future delivery unless and until buyer pays money due on deliveries already made not a demand for adequate assurance).

In reviewing all the evidence, we conclude the jury's findings as to Champlin's demand for adequate assurance of performance is legally and factually sufficient. Points of error six, seven, eight, and nine are overruled.

USX's points of error ten through fourteen will be addressed together because each relates to the jury submission of whether Champlin performed under the contract. USX contends that: (1) as a matter of law, Champlin breached the contract; (2) special issues 1, 1A, and 1B were questions of law and not of fact; and (3) special issues 10 and 11 improperly placed the burden of proof on USX on the issue of Champlin's performance of the contract.

Special issues 1, 1A, and 1B inquired whether there was a "binding contract" between Champlin and USX, and what were the obligations under that contract. On appeal, USX claims that neither party alleged that the contract was ambiguous; therefore, the construction of the cumene contract is a question of law solely for the court's determination. *See Sun Oil Co.* *(Delaware) v. Madeley,* 626 S.W.2d 726, 732 (Tex.1981). Nevertheless, responding to Champlin's motion for summary judgment, USX wrote the following under the heading "Fact Issues Which Must Be Resolved":

> Such amendment and Response further raise at least *an issue of fact* as to ... whether the contract *was in effect* for the period ending June 30, 1980 in view of the fact that the contract price was neither fixed nor agreed upon for such period, and whether USS intended to be bound under such circumstances.

TEX.BUS. & COM.CODE ANN. sec. 2.305(a) provides that "parties if they so intend can conclude a contract for sale even though the price is not settled." Comment 2 to this section indicates that in most instances whether or not the parties intended a contract is a question to be answered by the trier of fact.

We also note that in the final judgment the trial court ruled while it disagreed with USX's issue of law contention, the court found that "if decided as a matter of law, the answer to each of the Issues by the Court would be identical to the answers given by the jury."

By point of error ten, USX argues that as a matter of law Champlin breached the contract by failing to determine and present prevailing prices; thereby, the trial court erred in denying USX's motion to disregard the jury's answers pertaining to this issue. USX contends that the terms of the contract unambiguously obligates Champlin to present the prevailing price to USX, and that the prices Champlin submitted to USX were not the prevailing price. The relevant portions of the contract are as follows:

> A. The "Contract Price" for cumene sold hereunder shall be the prevailing price in cents per pound, FOB Gulf Coast, for cumene produced in the lower 48 states of a quality generally acceptable for the manufacture of phenol sold and purchased between unrelated parties for domestic consumption in quantities of not less than 50 million pounds per year and under contracts for terms of one

year or longer. The prevailing price to be used in pricing cumene to be delivered during the initial six-month or shorter period starting on the Commencement Date and ending on June 30, 1980, and for each six-month period thereafter shall be determined by CHAMPLIN and presented to USS prior to commencement of such period. If USS disagrees with such determination at a time when CHAMPLIN is selling at least 50 million pounds a year of cumene to a third party under a contract in which a prevailing price in cents per pound, FOB Gulf Coast, is determined, any such determination then in effect under such other contract shall be binding hereunder....

B. Contract Price determined for any period of time within the term of this contract shall be effective as of the beginning of such period. Each such determination shall be made, *if possible*, prior to the beginning of the period of time concerned, *but deliveries shall not be interrupted* because of delayed determination and, pending such determination, deliveries shall be conditionally billed and paid for at the price proposed by CHAMPLIN. [Emphasis added.]

The record reflects Champlin determined and presented prevailing market prices for future liftings on six different occasions between February 26, 1980, and June 17, 1980. At the trial Champlin presented the testimony of Charlie Sievert, a recognized expert in the field of petro-chemical pricing. Sievert testified, on the basis of all market intelligence available at the time, that each of Champlin's nominations were reasonable and in good faith.

A reading of the contract would indicate that Champlin was not required to determine and present a price that USX would agree upon. It specifically contemplated possible disagreement and, in that event, required USX to lift, treating Champlin's nomination as a conditional billing price to be later adjusted retroactively.

In examining the record, we cannot say that as a matter of law USX established that Champlin breached the contract by failing to determine and present prevailing prices.

■ USX next argues that the trial court failed to present to the jury requested issues concerning Champlin's failure to perform under the contract by not offering USX the prevailing price that Champlin offered to G.E. In essence, USX is arguing that the G.E. contract should have triggered the price dispute resolution clause, whereby the prevailing price determined under another Champlin contract to a third party would be binding on Champlin and USX. As a result, if Champlin had not offered USX the prevailing price offered to G.E. then Champlin would have breached the contract.

G.E. and Champlin on July 11, 1980, agreed on a price for cumene. That same day Champlin mailed a letter to USX confirming cancellation based on USX's nonperformance. The record reflects that as early as February 28, 1980, USX voiced its disagreement with Champlin's prevailing price determination. Subsequently, on April 29, 1980, the parties agreed to a package that would include a purchase price of 26¾ cents per pound of cumene for the first installment period (April 1, 1980, to June 30, 1980). This agreement indicates that the disagreement over the prevailing price in the first period was resolved. Regardless, during the first installment period there was no third-party contract to trigger the price dispute resolution provision. A price determination was not yet made under the G.E. contract.

As for the second installment period, July 1, 1980, to December 31, 1980, the facts are more disputed as to whether Champlin fixed a price with G.E. under the G.E. contract before its cancellation of USX's contract. For this reason, USX submitted requested issue 3, which asked if on or about July 11, 1980, Champlin refused to perform under the contract, and special issue 6, which inquired whether Champlin's refusal to perform under the USX contract occurred prior to the initial G.E. price determination. However, we find that special issues 10 and 11 asking whether Champlin failed to determine and present to USX the

contract price for the first and second installment periods substantially covers the subject matter of requested issues 2 and 6.

In points of error thirteen and fourteen, USX complains that special issues 10 and 11 improperly placed the burden of proof as to Champlin's breach of contract on USX. USX argues that special issues 10 and 11, as set forth in requested issues 1 and 2, should have properly asked whether Champlin *did* determine and present the prevailing price during the first two installment periods of the contract. The crux of USX's argument is that Champlin's obligation to present the prevailing price is a condition precedent to USX's obligation to lift cumene; thereby, it is an essential element of Champlin's recovery for which Champlin must bear the burden of proof. We disagree.

 Placing the burden as to a material issue upon the wrong party is generally reversible error. *C. & R. Transport, Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex. 1966); *Gulf Oil Corp. v. Vestal*, 231 S.W. 2d 523, 526 (Tex.Civ.App.—Fort Worth 1950), *aff'd*, 149 Tex. 487, 235 S.W.2d 440 (1951). The present issue is so worded that it places the burden of proof upon USX. But it was USX who brought forth this issue, as evident by USX's second amended original answer and counterclaim, by alleging that Champlin had breached the contract by failing to present and determine prevailing prices. Moreover, whether or not Champlin determined and presented a prevailing price is not an essential element to Champlin's recovery. Although the contract expressly states that Champlin shall determine and present a prevailing price to USX prior to commencement of each period, the contract goes on to state that "such determination shall be made, *if possible*, prior to the beginning of the period of time concerned, but deliveries *shall not* be interrupted because of delayed determination." Clearly, the contract contemplated that there would be possible differences of opinion as to the prevailing price; therefore, the contract provided that USX would accept and lift, at a conditional billing price subject to later adjustments, at the prices proposed by Champlin. As a result, special issues 10 and 11 correctly placed the burden of proof of whether Champlin determined and presented the prevailing price on USX. Points of error ten through fourteen are overruled.

USX argues in point of error three that Champlin's damage award erroneously contained incidental damages not legally recoverable for breach of contract, and that special issue 7A should have instructed the jury not to consider the decline in the value of benzene as incidental damages. Champlin purchased a large quantity of benzene in the spring of 1980 for use in manufacturing cumene for USX. Subsequently, when USX did not lift cumene Champlin claimed that it was not able to utilize the prepurchased benzene until later in the summer of 1980, when the market value of benzene had declined. Champlin reasoned that had there not been a contract with USX, it would have waited to purchase benzene until June 1980; thereby, the benzene would have been purchased at a lower price avoiding the effects of a decline in the market value of the prepurchased benzene. Champlin claimed that this decline in the value of benzene was an incidental damage for which it was entitled to an award of damages.

Under TEX.BUS. & COM.CODE ANN. sec. 2.708(b), in addition to profit, the seller may recover incidental damages. Incidental damages are defined in TEX.BUS. & COM.CODE ANN. sec. 2.710 (Tex.UCC) (Vernon 1968) as "any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods *after* the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach." [Emphasis added.] It is clear that section 2.710 was intended to cover only those expenses contracted by the seller after the breach and occasioned by such things as the seller's need to care for, and, if necessary, dispose of, the goods in a commercially reasonable manner. *Nobs Chemical, U.S.A., Inc. v. Koppers Co., Inc.*, 616 F.2d 212, 216 (5th Cir.1980) (incidental damages not recoverable for loss of a quantity discount not re-

ceived from supplier by reason of buyer's breach).

■ As previously discussed, a basic condition to Champlin's ability to prove lost volume status is that Champlin must be able to show that it would have made the resale regardless of USX's breach. Therefore, Champlin's expense for benzene would have been incurred by Champlin regardless of USX's breach. Champlin's expense for benzene is one of the variable costs of manufacture incurred by Champlin, it is not an incidental damage caused by the breach itself nor is it incidental as an added expenditure needed to perfect a resale. At best, the benzene expense was a consequential damage, a category of damages not available to sellers under the Uniform Commercial Code. *See id.* at 216; TEX.BUS. & COM.CODE ANN. sec. 1.106(a) (Tex.UCC) (Vernon 1968); *see also* Anderson, *Damages for Sellers Under the Code's Profit Formula,* 40 SW.L.J. 1021, 1053–54 (1986).

In recent opinions, the supreme court has emphasized its approval of broad issue submission. *Island Rec. Dev. v. Republic of Texas Sav.,* 710 S.W.2d 551, 555 (Tex.1986) (opinion on reh'g); *Lemos v. Montez,* 680 S.W.2d 798, 801 (Tex.1984). A trial court is vested with broad discretion in submitting the charge. *DeAnda v. Home Ins. Co.,* 618 S.W.2d 529, 534 (Tex.1980). To determine whether an alleged error is reversible we must consider the evidence and the charge in its entirety. *Island Rec. Dev.,* 710 S.W. 2d at 555.

■ The second paragraph of special issue 7A, in accordance with TEX.BUS. & COM.CODE ANN. sec. 2.708(b), correctly defines the measure of damages as the profit which Champlin would have made from full performance by USX including any incidental damages also incurred. Next, consequential damages are defined followed by explicit instruction not to include any amount as consequential.[5] This portion of the charge is a correct statement of the law in regards to the profit formula calculation of damages. Last, the charge defines incidental damages in detail by tracing the language of TEX.BUS. & COM. CODE ANN. sec. 2.710.[6]

We must assume that jurors read, understand, and comply with the written instructions of the trial court. *Turner, Collie & Braden v. Brookhollow, Inc.,* 642 S.W.2d 160, 167 (Tex.1982). The benzene transaction fits squarely within the court's definition of consequential damages. The charge to the jury instructed them not to consider consequential damages. Additionally, from the Arthur Young calculation, exhibit 220, and the other available evidence the jury could have properly awarded an amount in excess of the $9,000,000 even without the evidence of the benzene transaction.[7] We must not assume that the answer to special issue 7A was reached in breach of the court's instruction. Accordingly, point of error three is overruled.

Under point of error fifteen, USX urges that the trial court erred in awarding prejudgment interest of 10% per annum. The judgment states that the interest was calculated under TEX.REV.CIV.STAT.ANN. art. 5069–1.05, sec. 2 (Vernon Supp.1988) and in accordance with the decision in *Perry Roofing Co. v. Olcott,* 722 S.W.2d 538 (Tex.App.—Fort Worth 1986), *aff'd,* 744

5. Consequential damages are those which do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the nonbreaching party in its dealings, often with third parties which were an approximate result of the breach. You are also instructed that you are not to include any amount as consequential, special, or penal damages.

6. Incidental damage to an aggrieved seller include any commercially reasonable charges, expenses, or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, if any, in connection with return or resale of the goods or otherwise resulting from the breach, if any.

7. The Arthur Young calculation showed the following elements of damage before interest:

| | |
|---|---|
| Lost profits (after all credits) | $ 9,333,687 |
| Related damages—loss on benzene | 680,905 |
| Total | $10,014,592 |

The record also contained a separate damage calculation by Hilman, a Champlin accountant, that totaled $13,555,000.

S.W.2d 929 (Tex.1988).[8] The judgment further makes an alternative calculation of interest in accordance with TEX.REV.CIV. STAT.ANN. art. 5069-1.03 (Vernon 1987) in the event that the *Perry Roofing* decision is reversed.

■ The statutory prejudgment interest rate set forth in TEX.REV.CIV.STAT. ANN. art. 5069-1.03 applies to "accounts and contracts ascertaining the sum payable" and when the contract is silent on prejudgment interest. *Mo.–Kan.–Tex. R. Co. v. Fiberglass Insul.*, 707 S.W.2d 943, 948 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). The requirement that the contract set out a sum payable has always been liberally construed. *La Sara Grain v. First Nat. Bank of Mercedes*, 673 S.W. 2d 558, 567 (Tex.1984). It is sufficient if the contract provides the conditions upon which liability depends and fixes a measure by which the sum payable can be ascertained with reasonable certainty. *Federal Life Ins. Co. v. Kriton*, 112 Tex. 532, 249 S.W. 193, 195 (Tex.Comm'n App.1923, opinion adopted).

■ The *Perry Roofing* decision has established that prejudgment interest based on TEX.REV.CIV.STAT.ANN. art. 5069-1.-05, sec. 2, is available in a contract action where the contract itself does not fix the amount of damages. *Perry Roofing Co.*, 722 S.W.2d at 544. In the *Perry Roofing* case, our court found that the contract itself did not provide a sum ascertainable upon which to award interest "because the suit is for replacement value of the roof as well as for interior damage resulting from breach of contract." *Id.*

■ In the case at bar, the cumene contract fixes a measure by which the sum payable can be ascertained—the prevailing price in cents per pound, F.O.B. Gulf Coast, for cumene. If USX had desired to do so, USX could have reasonably ascertained the damages arising from its breach at the time Champlin gave notification of the breach. Further, the cumene contract pro-

vided the condition upon which liability depends—USX's obligation to lift the designated amount of cumene. We conclude that the prejudgment interest in this case is more appropriately governed by TEX.REV. CIV.STAT.ANN. art. 5069-1.03 which provides an interest rate of 6% per annum. USX's fifteenth point of error is sustained.

USX's final points of error challenge the trial court's award for attorneys' fees as being excessive and an abuse of discretion. On a recovery of $15,475,919 the court awarded Champlin attorneys' fees through the trial level of $3,000,000 and attorneys' fees of $550,000 on the appeal level up to the Supreme Court of Texas. It is within the discretion of the trial court to award attorneys' fees. *Fambro v. Fambro*, 635 S.W.2d 945, 949 (Tex.App.—Fort Worth 1982, no writ). The trial court's assessment of attorneys' fees will not be overruled unless there is a clear abuse of discretion. *Magers v. Durham*, 720 S.W.2d 871, 876 (Tex.App.—Fort Worth 1986, writ dism'd). We are not allowed to substitute our judgment for that of the trial court, but we have to determine if that court's decision was arbitrary or unreasonable. *See Landry v. Travelers Insurance Co.*, 458 S.W.2d 649, 651 (Tex.1970).

The trial court has great latitude in fixing attorneys' fees. The trial court must consider several elements, including the nature and complexity of the case, the amount of money involved, the responsibility assumed by the attorney, the benefits resulting to the client, and the time and labor involved. *Morgan v. Morgan*, 657 S.W.2d 484, 491–92 (Tex.App.—Houston [1st Dist.] 1983, writ dism'd); *see also* SUPREME COURT OF TEXAS, RULES GOVERNING THE STATE BAR OF TEXAS art. XII, sec. 8 (Code of Professional Responsibility) DR 2–106 (1973).

This lawsuit was filed on January 18, 1983, against USX; USX being a powerful corporate adversary. The case went to trial on April 27, 1987. The record before us is voluminous, containing numerous mo-

---

**8.** A supreme court decision in *Perry Roofing* had not been rendered at the time the parties in the instant case had filed their briefs. Since this time, the supreme court has affirmed the *Perry Roofing* decision.

tions, trial briefs, a statement of facts over 1800 pages, 300 plaintiff's exhibits, and appellate briefs each in excess of 50 pages. The record clearly indicates both parties exerted tremendous time and labor in the preparation of the trial.

■ The attorneys' fees must bear some reasonable proportion to the amount involved. *Flint & Assoc. v. Intercon. Pipe & Steel*, 739 S.W.2d 622, 625 (Tex.App.—Dallas 1987, no writ); *National Life & Accident Ins. Co. v. Runnels*, 227 S.W.2d 351, 353 (Tex.Civ.App.—Dallas 1950, no writ). As previously stated, Champlin was awarded $15,475,919; thus, the award of attorneys' fees is approximately 19% with relation to the amount received. When considering the amount of the successful defeat of USX $2,800,000 counterclaim, the total amount involved was $18,275,919. The determination of what is reasonable cannot be made by application of some mechanical formula. *Commonwealth Lloyd's Ins. Co. v. Thomas*, 678 S.W.2d 278 (Tex.App.—Fort Worth 1984, writ ref'd n.r. e.).

Munn, the attorney for Champlin, assumed full responsibility for a case in which settlement negotiations were futile. Dean, USX's original counsel, testified that Munn "did an extraordinarily good job and got a good result for his client."

Finding no error in the assessment of attorneys' fees, we overrule USX's final points of error.

The trial court's judgment is reversed as to the award of 10% per annum prejudgment interest, and we remand to the trial court for the correct calculation in accordance with TEX.REV.CIV.STAT.ANN. art. 5069–1.03 at 6% per annum. All other portions of the trial court's judgment are affirmed.