TENNESSEE GAS PIPELINE
COMPANY, Appellant,

v.

The LENAPE RESOURCES
CORPORATION, et al.,
Appellees.

No. 04–92–00613–CV.

Court of Appeals of Texas,
San Antonio.

Aug. 25, 1993.

Rehearing Denied Jan. 26, 1994.

Thomas H. Watkins, C.A. Davis, Elizabeth C. Bloch, John R. Hathaway, Hilgers & Watkins, P.C., Austin, for appellant.

Dwight A. Dalrymple, Tejas Gas Corp., Rudy A. England, Michael L. Grove, Kendall Barrett, Hutcheson & Grundy, L.L.P., Houston, Charles R. Roberts, Emerson Banack, Jr., Susan Gellis Wozniak, William T. Armstrong, III, Foster, Lewis, Langley, Gardner & Banack, Inc., Gerald T. Drought, Martin, Drought & Torres, Inc., San Antonio, Frank Douglass, Scott, Douglass & Luton, L.L.P., Dallas, Elizabeth N. Miller, Jane M.N. Webre, Scott, Douglass & Luton, L.L.P., Austin, for appellees.

Before BUTTS, PEEPLES and RICKHOFF, JJ.

### OPINION

BUTTS, Justice.

Appellant Tennessee Gas Pipeline Co. (Tennessee) appeals from an order granting appellees' motion for partial summary judgment and an adverse judgment following a non-jury trial. Appellee and cross-appellant The Lenape Resources Corp. (Lenape) appeals from an order granting Tennessee's motion for partial summary judgment and an adverse judgment on its counterclaim. We affirm in part and reverse and remand in part.

### I. FACTS

Appellant Tennessee, as buyer, entered into a Gas Purchase and Sales Agreement (the GPA) on January 16, 1979. The original sellers were National Exploration Company and Eton Partnership. Appellee The Lenape Resources Corp. (Lenape) is the successor to those sellers.[1] Appellee Gulf Energy and Development Corporation (Gulf) is the gatherer.[2] Appellees Tesoro Exploration and Production Co. (Tesoro) and Coastal Oil and Gas Corp. (Coastal) were not parties to the GPA, but later entered a farmout agreement with Lenape. The term of the GPA is twenty years or until all the committed oil and gas leases terminate.

The GPA obligates Tennessee to take or pay for gas produced from committed reserves, with the quantity to be determined by the Seller's delivery capacity. The reserves are those located in and under various oil, gas and mineral leases in Zapata County. Lenape unitized all or portions of three of the committed leases and formed the Fantina Yzaguirre Gas Unit.

In 1989, the lessors in the Fantina Yzaguirre Gas Unit sued Lenape alleging that their leases had terminated because of failure to produce in paying quantities. The lessors thereafter entered a settlement agreement with Lenape by which they confirmed the leases. (The settlement agreement states that the leases are valid and subsisting and have been at all times.) Lenape then created two units (the Guerra A and Guerra B Units) each containing half committed acreage and half non-committed acreage. Lenape also entered a farmout agreement with Tesoro and Coastal pursuant to which Lenape assigned certain rights in the Fantina Yzaguirre leases, insofar as they were contained within the Guerra A and B Units. Tesoro drilled the Guerra A Well inside the Guerra A Unit but outside the acreage originally committed to the GPA. The Guerra B Well is similarly located within the Guerra B Unit but outside the originally committed acreage. Production from the Guerra A and B Wells is substantially greater than was production from the original wells physically located on the committed acreage.

---

1. For the sake of clarity, Lenape and any of its predecessors involved in this contract will be referred to as "Lenape."

2. Gulf is a party to the suit because it was a party to the GPA. In addition, as noted below, Gulf filed its own declaratory judgment action to protect its rights in a Gas Measurement Agreement and a Gas Transportation Agreement with Tennessee.

Tennessee brought suit against appellees seeking a declaratory judgment construing various provisions of the GPA. Tennessee also asserted claims under the Deceptive Trade Practices–Consumer Protection Act (DTPA) and the Uniform Commercial Code (UCC). Lenape brought a counter-suit for breach of contract, anticipatory repudiation, economic duress and coercion, and tortious interference with contract. Gulf also brought its own declaratory action to protect its interest in a Gas Measurement Agreement and a Gas Transportation Agreement between Gulf and Tennessee whereby Gulf is paid for transportation of all gas dedicated to the GPA.

The court granted partial summary judgment denying Lenape's claims of anticipatory repudiation, breach of contract for underpayments prior to April 24, 1987, tortious interference with contract, and economic duress and coercion. The court further granted summary judgment that the GPA was not an output contract subject to section 2.306 of the UCC, Tennessee's DTPA claims were actually breach of contract claims not recognizable under the DTPA, and Tennessee lacked standing to challenge the validity of the underlying leases. In a second partial summary judgment, the court held that Lenape's counterclaim for loss of profits from a farm-out opportunity was barred by limitations and provisions of the business and commerce code. Following a non-jury trial of the remaining issues, the court made various declarations regarding the parties' rights under the GPA, which declarations are discussed in more detail below.

## II. OUTPUT CONTRACT; UCC SECTION 2.306

In point of error one, Tennessee contends that the court erred in granting summary judgment that the GPA is not an output contract governed by UCC section 2.306. The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.

**3.** All citations to the business and commerce code are to the Texas UCC unless otherwise

Tex.R.Civ.P. 166a(c); *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex. 1985); *Swilley v. Hughes*, 488 S.W.2d 64, 67 (Tex.1972). In deciding whether a disputed material fact issue precludes summary judgment, the reviewing court will take as true all evidence favoring the non-movant. *Nixon*, 690 S.W.2d at 548–49; *Montgomery v. Kennedy*, 669 S.W.2d 309, 311 (Tex.1984). Every reasonable inference from the evidence will be indulged in favor of the non-movant, and any doubts will be resolved in his favor. *Nixon*, 690 S.W.2d at 549; *Montgomery*, 669 S.W.2d at 311.

The summary judgment at issue in this point of error may be upheld only if, as a matter of law, (1) the GPA is not an output contract or (2) it is an output contract but is not governed by section 2.306 of the UCC. *See* Tex.Bus. & Com.Code Ann. § 2.306 (Tex. UCC) (Vernon 1968).[3]

### A. Whether the GPA is an output contract.

■ An output contract measures the quantity to be sold by reference to the seller's good-faith output. *See Cooper v. Fortney*, 703 S.W.2d 217, 219 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). An ordinary supply contract, on the other hand, measures the quantity to be sold by stating a specific, fixed amount. *Id.*

■ The quantity provision of the GPA states, in pertinent part, as follows:

3. *Quantity:*

(a) Seller agrees to sell and deliver to Buyer, and Buyer agrees to purchase and receive, or pay for if available and not taken, Seller's pro rata part of the following quantities of gas produced from the committed reserves:

. . . .

(ii) A quantity of gas well gas equal to eighty-five percent (85%) of Seller's delivery capacity.

. . . .

The provision does not state a specific quantity of gas that Tennessee is obligated to

stated.

purchase. Rather, the quantity is dependent upon "Seller's delivery capacity," which is defined in section 1(f) of the GPA as,

> Seller's pro rata part of the average amount of gas well gas per day which can be efficiently withdrawn from the wells on the lease(s) ... the production from which is covered by this Agreement and which is available for delivery....

This measure of quantity establishes that the GPA is an output contract. *See Cooper v. Fortney*, 703 S.W.2d at 219; *see also United States v. Great Plains Gasification Assoc.*, 819 F.2d 831, 835 n. 6 (8th Cir.1987); *American Exploration Co. v. Columbia Gas Transmission Corp.*, 779 F.2d 310, 311 (6th Cir.1985); *Columbia Gas Transmission Corp. v. Larry H. Wright, Inc.*, 443 F.Supp. 14, 20 (S.D.Ohio 1977).

We find unpersuasive appellees' argument that the GPA is not an output contract because there is a finite amount of gas subject to the agreement and, therefore, Tennessee is obligated under the contract to purchase a legally specific quantity of gas. This argument ignores the fact that the term of the GPA is for twenty years and that Tennessee's obligation is to buy 85% of Seller's delivery capacity *in each contract year*. Nowhere did Tennessee agree to purchase the entire, though finite, amount of gas attributable to the committed leases. Over the course of twenty years and considering reasonable increases in production (see discussion below), the amount produced could eventually correspond to the entire amount of gas existing under the leases. This is not equivalent, however, to providing that Tennessee is required to purchase all of the gas underlying the leases, regardless of how or when that gas is produced.

Appellee Gulf states in its brief, "Given that there is a finite quantity of gas to be produced, as defined by the scope of the dedication, the variable in the Contract is not the quantity of gas to be produced, but rather the *rate* at which the gas will be produced." Because quantity is computed by multiplying the rate of production by the duration of production, a variable rate contained within a fixed-term contract leads to the conclusion that the quantity term of the contract is also variable. Thus, we cannot conclude that the GPA contains a specific quantity term.

Because the quantity of gas covered by the GPA is not specifically stated but is determined in accordance with the Seller's production or delivery capacity, we hold that the GPA is an output contract. *See Cooper v. Fortney*, 703 S.W.2d at 219.

**B. Whether the GPA is governed by section 2.306.**

■ Section 2.306(a) of the Texas UCC states:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

TEX.BUS. & COM.CODE ANN. § 2.306(a) (Vernon 1968). Appellees contend that this provision does not govern the GPA because it was "varied by agreement," as permitted under section 1.102 of the UCC. TEX.BUS. & COM. CODE ANN. § 1.102(c) (Vernon 1968); *see also Jon–T Chem., Inc. v. Freeport Chem. Co.*, 704 F.2d 1412, 1416 (5th Cir.1983). Subsection (c) of section 1.102 provides that the effect of provisions of the UCC may be varied by agreement,

> except as otherwise provided in this title and except that the obligations of good faith, diligence, reasonableness and care prescribed by this title may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

TEX.BUS. & COM.CODE ANN. § 1.102(c) (Vernon 1968).

Appellees urge that the parties determined the standard by which the reasonableness of the output was to be measured by including a provision granting the Seller the unilateral

right to determine production levels.[4] This, however, is merely a reaffirmation of the fact that the GPA is an output contract.

We believe that the language in section 1.102, "the parties may by agreement determine the standards by which the performance of such obligations is to be measured," requires that the agreed standard be clear and specific. For example, the parties to the GPA could have provided minimum or maximum quantities of gas to be produced, or maximum levels of increased production in any one year. Such provisions furnish concrete standards of reasonableness. *See* Tex. Bus. & Com.Code Ann. § 2.306 comment 3. Simply providing that the Seller may determine levels of production provides no standard at all. The fact that one party has the right and ability to control production, and thus also control the other party's obligation to purchase, is precisely why a duty of good faith and reasonableness is required.

■ The GPA clearly gives the Seller the right to increase production by drilling new wells. To this extent, the agreement does not require that production levels be *limited* to prior output. We cannot accept, however, that this right to increase production includes the right to do so unreasonably or in bad faith. Even if the parties intended to give Seller the right to increase production unfettered by obligations of good faith or reasonableness, this "standard" is "manifestly unreasonable" and unenforceable under section 1.102(c). Obligations of good faith and reasonableness *cannot* be waived under the UCC. Tex.Bus. & Com.Code Ann. § 1.102(c) (Vernon 1968).

Appellees rely on *Exxon Corp. v. Atlantic Richfield Co.*, 678 S.W.2d 944 (Tex.1984), for the proposition that a good faith obligation cannot vary the "agreement made by the parties and embodied in the contract." *Id.* at 947. *Exxon* is distinguishable. In that case,

the contract contained a specific provision dictating when the contract would terminate. The issue before the court was whether there was an implied covenant of non-termination, even though the express termination provision was fulfilled. In that context, the court held, "There can be no implied covenant as to a matter specifically covered by the written terms of the contract. The agreement made by the parties and embodied in the contract itself cannot be varied by an implied good-faith-and-fair-dealing covenant." *Id.* (citation omitted).

The holding of *Exxon* might have applied to the present case if the GPA stated that Tennessee was obligated to purchase a specific quantity of gas and Tennessee thereafter urged that that specific quantity was not tendered in good faith. In such a case, there is a precise measure of performance agreed to by the parties which cannot thereafter be varied by imposing a good faith requirement. *Exxon* might also have applied if the GPA contained a specified minimum or maximum quantity[5] and Tennessee thereafter urged that a tender within that range was made in bad faith. *See* Tex.Bus. & Com.Code Ann. § 2.306 comment ·3 (Vernon 1968). The agreement here at issue, however, does not contain a specific quantity provision nor does it contain any stated minimum or maximum quantity. Rather, the quantity is dependent on the Seller's delivery capacity or output, the precise situation contemplated by section 2.306. Imposing a duty of good faith and reasonableness in this case does not controvert any specific provision in the GPA. Thus, we conclude that the GPA is subject to the good faith and reasonableness requirements contained in section 2.306.

Appellees further urge that if section 2.306 applies to the quantity provision of the GPA, other provisions of the GPA will be rendered

---

4. Section 5 of the GPA provides, in part,
Seller reserves the following prior rights ...:
(a) To operate its property free from any control by Buyer in such a manner as Seller, in its sole discretion, may deem advisable, including without limitation, the right, but never the obligation, to drill new wells, to repair and rework old wells, and to plug any well or surrender any lease or portion thereof....

5. As discussed above, we reject appellees' contention that the GPA contains a maximum quantity because there is a finite amount of gas underlying the committed leases. We believe that a maximum amount, as contemplated by the comment to section 2.306, means a specifically stated or at least measurable amount. No such term appears in the GPA.

meaningless. Specifically, they assert that application of section 2.306 will negate the Seller's right to drill new wells (section 5(a) of the GPA) and the provision that the Seller has no obligation to maintain any predetermined level of deliverability (section 3(c) of the GPA). We disagree. Both of these sections contemplate that production levels will vary, either decreasing or increasing, at the Seller's good faith discretion. Our holding does not abrogate these rights, nor does it give Tennessee the power to dictate any particular level of production. The parties have agreed, by virtue of these sections, to allow the Seller to increase (or decrease) production. This, however, does not vary the terms of section 2.306 requiring that any increase in the rate of production be in good faith and *reasonably* proportionate to prior output.[6] *See* TEX.BUS. & COM.CODE ANN. § 2.306 comment 2 (Vernon 1968) (sudden expansion is not within scope of contract; normal expansion undertaken in good faith is within scope).

■ In summary, the GPA is an output contract and, while production under the GPA is subject to increase and is not limited to prior levels of production, any increase in production is governed by the good faith and reasonableness provisions of section 2.306. Clearly there exist issues of fact regarding whether appellees' increase in production was reasonable and whether such increase was made in good faith. The trial court erred in granting summary judgment on the ground that the GPA was not an output contract governed by section 2.306. Point of error one is sustained.

Because of our disposition of point of error one, we need not address the merits of point of error two (which asserts that if the GPA is not an output contract it is unenforceable for lack of mutuality and lack of definiteness). In point of error nine, Tennessee contends that the court erred in awarding appellees all of the certificates of deposit and other funds held in escrow. These escrow funds are the amounts Tennessee has paid under protest for disputed quantities of gas. We have held above that Tennessee is entitled to litigate the issues of appellees' good faith and the reasonableness of the increased production. A resolution of these issues may have an effect on the amount of the escrowed funds, if any, to which appellees are entitled. Point of error nine is sustained insofar as it requests a redetermination of the amount of the escrowed funds to which each party is entitled.

### III. STANDING TO CHALLENGE THE LEASES

■ In point of error three, Tennessee contends that the court erred in granting summary judgment that Tennessee has no legal or contractual right to claim that the Fantina Yzaguirre leases had terminated. Tennessee urges that it has standing because its obligations under the GPA are affected; it contends that if the leases terminated according to their terms for failure to produce in paying quantities, then the leases were automatically released from the GPA.

The joint motion for partial summary judgment filed by appellees Tesoro, Coastal, and Lenape asserts that they are entitled to summary judgment because the GPA is unambiguous as a matter of law and Tennessee has no legal or contractual right to claim that the leases have expired. In determining whether the court properly granted this motion for summary judgment, we apply the familiar rules recited above. *See* TEX.R.CIV.P. 166a(c); *Nixon v. Mr. Property Management Co.,* 690 S.W.2d at 548–49.

■ There is no dispute that Tennessee is not a party to the leases, nor is it a party to the settlement agreement which states that the leases have remained in effect since they were executed.[7]

6. Appellees urge that if production is tied to prior production, there can be no expansion. This is clearly not the case. Over the course of the twenty-year contract, appellees were and are free to increase production each year, if desired, by a reasonable amount. Application of section 2.306 to the GPA simply prohibits a *sudden* increase over a short period of time, if that increase is unreasonable.

7. The settlement agreement states, in pertinent part,

[Lessors and Lessees] do hereby agree, confirm and declare that said Fantina Yzaguirre leases

The general rule is that only the parties to a contract have the right to complain of a breach thereof; and if they are satisfied with the disposition which has been made of it and all claims under it, a third person has no right to insist that it has been broken.

*Bruner v. Exxon Co.*, 752 S.W.2d 679, 682 (Tex.App.—Dallas 1988, writ denied); *accord Merrimack Mut. Fire Ins. Co. v. Allied Fairbanks Bank*, 678 S.W.2d 574, 577 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). An exception to this rule is that one who is not in privity to the written agreement may show that he is eligible to bring an action on the contract as a third-party beneficiary. *Bruner v. Exxon Co.*, 752 S.W.2d at 682–83; *Merrimack Mut. Fire Ins. Co.*, 678 S.W.2d at 577. Of the three types of third-party beneficiaries—donee beneficiaries, creditor beneficiaries, and incidental beneficiaries—only the first two may enforce contracts to which they are not parties. *Bruner v. Exxon Co.*, 752 S.W.2d at 683. One who will be benefitted only incidentally by the contract cannot maintain an action thereon. *Id.* Further, a contract will not be construed to have been made for the benefit of a third person unless such an intent clearly appears from the language of the instrument. *Id.* Any doubts are resolved against such an intent. *Id.*

In *Bruner v. Exxon Co.*, an assignee of royalties under a lease sued the lessor and lessee for wrongful cancellation of the lease. The lessor and lessee in that case entered a stipulation that they had conspired to destroy Bruner's rights, if any, to receive his proportionate share of the rentals. *Id.* at 682. Bruner, however, was not a party to the lease and the lease made no mention of him. The court held that he was merely an "incidental beneficiary" with no right to complain of the termination of the lease. *Id.* at 683. It also held that the assignment of rentals, which incorporated the terms and conditions of the lease, did not give him any additional right to control the disposition of the lease. *Id.*

In *Graham v. Turcotte*, 628 S.W.2d 182 (Tex.App.—Corpus Christi 1982, no writ), a note provided that the mortgagors would be liable for the bank's attorney's fees in the event of a default. After a default occurred, the mortgagors sued the bank and its attorney, alleging that the attorney's fees were excessive. The court held that the mortgagors, who were neither parties to nor third-party beneficiaries of the contract between the bank and its attorney, could not complain of the fees. *Id.* at 183–84. "The fact that the mortgagors' liability for attorney's fees was directly affected by the attorney's fee contract had no effect on the court's holding that the mortgagor had no standing to contest the attorney's fee contract." *Merrimack Mut. Fire Ins. Co.*, 678 S.W.2d at 577 (discussing the holding of *Graham v. Turcotte*, 628 S.W.2d 182).

We find the present case indistinguishable from *Bruner* and *Graham*. Tennessee is not a party to the leases, nor do the leases make any mention of Tennessee. Indeed, the leases were executed many years before Tennessee acquired its rights under the GPA. Obviously, the parties to the leases did not intend that they be made for Tennessee's benefit. At most, Tennessee is an incidental beneficiary of the leases with no right to claim that they had terminated. The fact that its obligations under the GPA may be affected by the leases has no effect on whether it has standing to contest those leases. Appellees demonstrated by means of the settlement agreement that the actual parties to the leases were satisfied that the leases had not terminated and Tennessee has no right to insist otherwise. *See Bruner v. Exxon*, 752 S.W.2d at 682.

■ We also note that the GPA does not give Tennessee any right to contest the validity of the leases. *See Bruner v. Exxon Co.*, 752 S.W.2d at 682 (assignment of rentals incorporating terms of lease gave no right to contest lease). Section 5 of the GPA is entitled "Reservations of Seller." Subsection (a)

---

in all of their terms, conditions and provisions have been from the dates of the leases, and currently are binding upon Plaintiffs and [others] ... and that the Fantina Yzaguirre leases

are valid and subsisting oil, gas and mineral leases covering all mineral interests owned by Plaintiffs and [others] and have been at all times since the dates of such leases.

of that section states that the *Seller* has the right to *surrender* any lease "when no longer *deemed by Seller* to be capable of producing gas in paying quantities." (Emphasis added.) It further provides, "Should *Seller terminate or surrender* any lease, or a portion thereof, covered by this Agreement, said lease or portion *shall be released* from the terms of this Agreement effective as of the date of such termination or surrender." (Emphasis added.)

Whether this section is ambiguous presents a question of law properly determinable by summary judgment. *See Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 529 (Tex.1987) (question of law). If a writing is not ambiguous, then construction of the written instrument is also a question of law for the court. *Westwind Exploration, Inc. v. Homestate Sav. Ass'n*, 696 S.W.2d 378, 381 (Tex.1985). "In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Gracia v. RC Cola–7–Up Bottling Co.*, 667 S.W.2d 517, 520 (Tex.1984).

Tennessee urges that under section 5(a) a lease is released from the agreement upon (1) a voluntary act of the Seller to surrender the lease or (2) an involuntary termination of a lease *according to its terms* by the Seller's failure to obtain production in paying quantities. There is no contention that appellees voluntarily surrendered the leases in issue; the first asserted ground for release has no application. The second asserted ground is *not supported by the language of the agreement*.

As between Tennessee and appellees, the GPA gives the Seller (appellees) the sole right to determine whether a lease is producing in paying quantities. It also provides for release of a lease if the *Seller* terminates or surrenders the lease. There is no provision for automatic release of the leases. The language governing release of the leases is unambiguous and should be given its plain grammatical meaning. *See Reilly v. Rangers Management, Inc.*, 727 S.W.2d at 529. We also note that the provision for release of the

leases is contained in the section of the GPA entitled "Reservations of Seller." Clearly, the parties intended that these rights, including the release of leases for failure to produce in paying quantities, were granted solely to the Seller. Section 5 gives Tennessee no right to control the operation or disposition of the leases.

For all the foregoing reasons, the court properly granted summary judgment that Tennessee has no legal or contractual right to claim that the leases have expired. Point of error three is overruled.

## IV. CONSTRUCTION OF SECTION 8(a) OF THE GPA

In points of error four and five, Tennessee contends that the court erred in its construction of section 8(a) of the GPA and that the evidence is legally and factually insufficient to support the court's finding that the parties intended that the price for non-regulated gas would escalate in accordance with section 102(b)(2) of the Natural Gas Policy Act (the annual inflation adjustment factor plus a growth factor) as opposed to the single escalator of the annual inflation adjustment factor alone.

Section 8(a) of the GPA states,

The price to be paid by Buyer to Seller from the effective date hereof for all gas delivered hereunder, or for the contract quantity if available and not taken by Buyer, shall be $2.067 per Mcf, escalating on the first day of January, 1979 and on the first day of each month thereafter for the term of this Agreement to the product obtained by multiplying the price in effect hereunder for the preceding month by the monthly equivalent of the *annual inflation adjustment factor* applicable for such month, *as such factor is defined in Section 102(b)(2) of the Natural Gas Policy Act of 1978*, Public Law 95–621.

(Emphasis added.) Unfortunately, "annual inflation adjustment factor" is not defined in section 102(b)(2) of the Natural Gas Policy Act; it is defined in section 101(a)(1) of that Act.[8] The term is, however, *used* in section

---

8. Section 101(a)(1) states,

(a) ANNUAL INFLATION ADJUSTMENT

FACTOR—

102(b)(2) to determine the maximum lawful price for certain types of natural gas:

   (b) MAXIMUM LAWFUL PRICE.—The maximum lawful price under this section for any month shall be—

     (1) $1.75 per million Btu's, in the case of April 1977; and

     (2) in the case of any month thereafter, the maximum lawful price, per million Btu's, prescribed under this subsection for the preceding month multiplied by the monthly equivalent of a factor equal to a sum of—

      (A) the *annual inflation adjustment factor* applicable for such month; plus

      (B)(i) .035, in the case of any month beginning before April 20, 1981; or

      (ii) .04, in the case of any month beginning after April 20, 1981.

(Emphasis added.)

     The first issue to be determined is whether section 8(a) of the GPA is ambiguous. This presents a question of law. *Reilly v. Rangers Management, Inc.*, 727 S.W.2d at 529; *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex.1980). "A contract . . . is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d at 519. We must conclude that the meaning of section 8(a) is uncertain and that the provision is ambiguous. The parties may have intended that the price would escalate in accordance with the annual inflation adjustment factor, *as defined in section 101(a)(1)* of the Natural Gas Policy Act, or they may have intended that the price would escalate in accordance with the annual inflation adjustment factor, *as used in section 102(b)(2)* of the Act. It is not certain from the face of the instrument which of these constructions the parties intended. Therefore, parol evidence was properly considered to ascertain the intent of the parties. *See R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d at 519.

We must now determine whether the record supports the court's conclusion that the parties intended a double escalator.

     In considering a "no evidence" or legal sufficiency point, we consider only the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). In considering a factual sufficiency point, we assess all the evidence and reverse for a new trial only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

The record reflects that the GPA was negotiated by Craig Gunter for Lenape and Charles Faulk for Tennessee. Gunter was deceased at the time of trial. Faulk testified that during negotiations, Gunter wanted to include in the GPA a double escalator pricing provision and sent Faulk a letter to that effect. Faulk wrote "No" on that letter and stated that he did so because he did not want to include the second escalator—the growth factor contained in section 102(b)(2). Faulk intended that the GPA include only one escalator—the annual inflation adjustment factor alone. Faulk testified that he "won that battle" and that the reference in section 8(a) of the GPA to section 102(b)(2) of the Natural Gas Policy Act was simply incorrect. He also stated, however, that he had no independent recollection of the negotiations on this particular contract and that Tennessee's legal department reviewed and approved the contract language before the GPA was executed.

Edward Dubbs, an account manager for Tennessee, testified that, in his opinion, section 8(a) of the GPA was not ambiguous and that it meant to use only the annual inflation

---

    (1) GENERAL RULE.—For purposes of this title, the annual inflation adjustment factor applicable for any month shall be the sum of—

     (A) a factor equal to one hundredth of the quarterly percent change in the GNP implicit price deflator; plus

    (B) a correction factor of 1.002.

adjustment factor. He stated that the reference to section 102(b)(2) makes no sense because that section provides an equation for escalation, not a definition of annual inflation adjustment factor. Dubbs acknowledged that his reading of section 8(a) requires deleting the reference to section 102(b)(2). He also acknowledged that at the time the GPA was executed Tennessee was seeking to secure as much gas as possible and that the contract contemplated that the Seller would get the highest possible price. Other witnesses similarly testified that it was a seller's market during this period of time, that Tennessee was doing all that it could to secure reserves of gas for its future needs, and that it was Tennessee's intent to pay the highest price in order to secure those reserves.

An independent consultant, Jonathan Ellis, testified that, in his opinion, section 8(a) was consistent and that the usage of the entire phrase "the monthly equivalent of the annual inflation adjustment factor applicable for such month, as such factor is defined in Section 102(b)(2)" is clear. He stated that, while annual inflation adjustment factor is defined in section 101(a)(1), it is given a special usage (thus definition) in section 102(b)(2). He testified that section 102(b)(2) defines a factor as the sum of two other factors (annual inflation adjustment factor and growth factor). Section 101(a)(1) similarly defines annual inflation adjustment factor as the sum of two other factors. Thus, both sections can be construed as providing definitions by verbal statements of mathematical formulas. Ellis concluded that the *usage* of annual inflation adjustment factor is defined in section 102(b)(2).

■ Having reviewed the entire record, and particularly the evidence recited above, we conclude that the evidence is legally and factually sufficient to support the court's finding that the parties intended the double escalator stated in section 102(b)(2). Tennessee places great emphasis on the fact that its witness, Faulk, was the only person who

testified who actually negotiated this contract. Of course, Lenape's negotiator could not appear and controvert that testimony because he was deceased. The court, as the trier of fact, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Jones v. Tarrant Utility Co.*, 638 S.W.2d 862, 866 (Tex.1982); *Leyva v. Pacheco*, 163 Tex. 638, 358 S.W.2d 547, 549 (1962); *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792, 796 (1951). It was not required to accept Faulk's statement that he prevailed on the issue of whether a single or double escalator was to be included in the GPA. This is particularly true considering Faulk's statement that he had no independent recollection of the negotiations. The letter from Gunter to Faulk, proposing the double escalator and on which Faulk wrote "No," is not determinative of this issue. While the letter evidences Lenape's intent to include a double escalator and Tennessee's resistance to that provision during negotiations, it was written two months before the GPA was executed and sheds no light on the final agreement reached by the parties and incorporated into the GPA.[9]

We similarly reject Tennessee's contention that the parties must have intended a single escalator because at the time the GPA was executed, there was only one well on the subject leases and the price for gas produced from that well was regulated and included only a single escalator. The one well in existence at the time the GPA was executed has no bearing on the construction of the provision at hand; it is undisputed in the record that that well is not governed by section 8(a) of the GPA.

The evidence shows that Tennessee was actively seeking to secure as much gas as possible and was willing to pay high prices for it, the GPA in all other respects provides that Tennessee will pay the highest possible price,[10] and "annual inflation adjustment factor" is used in section 102(b)(2) in defining

9. We note in this regard that the language proposed in the letter is not the same as the language finally incorporated into the GPA. Thus, this pricing provision was obviously the subject of further negotiation.

10. While Tennessee's agreement to pay the "maximum lawful price" would apply only to regulated gas, this is some evidence indicating a willingness to pay dearly to secure reserves that would logically extend to unregulated gas.

the escalation rate. This evidence is sufficient to overcome the legal sufficiency challenge. While there is also evidence to the effect that the parties intended only a single escalator, we cannot conclude that that evidence greatly outweighs the evidence to the contrary or that the trial court's finding shocks the conscience of this court. *See Pool v. Ford Motor Co.*, 715 S.W.2d at 635. Thus, the factual sufficiency challenge must fail.

Points of error four and five are overruled.

## V. EFFECT OF UNITIZATION

■ In points of error six and seven, Tennessee contends that the court erred in (1) finding that it was obligated to purchase the Seller's interest in gas produced from wells located anywhere within the pooled units and (2) concluding that it was obligated to take or pay for at least 50% of 85% of the Seller's delivery capacity from all wells drilled within those units. It is Tennessee's position that it is obligated only to take or pay for gas produced from wells physically located on the committed acreage. This position is contrary to the GPA, the testimony at trial, and well-established law.

Tennessee points to provisions of the GPA stating that it is obligated to take or pay for gas produced *from the committed reserves;* "gas well gas" means gas produced *from Seller's leases;* "leases" includes the *lands covered thereby;* "committed reserves" means gas *located in and under the leases;* and "Seller's delivery capacity" is determined from gas withdrawn *from wells on the leases.* The GPA also, however, specifically provides that the Seller has the right to unitize the leases. Tennessee urges that any such unitization affects only the lessors' royalty interests under their leases and that unitization has no effect on its take or pay obligation under the GPA. This contention has no merit. The provision *in the GPA* granting the Seller the right to unitize also states that in the event of unitization, *"this Agreement* will cover Seller's interest in the unit attributable to the reserves committed hereunder." (Emphasis added.) Thus, all aspects of the GPA,

including those listed above, are subject to the effect of unitization.

Further, each of the underlying leases contains a clause stating that in the event of unitization, operations on any part of the unit shall be considered to be operations "from land covered by this lease." These leases were incorporated into the GPA without limitation by paragraph 10 of the GPA.[11] *See Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 908 (Tex.1982) (document in chain of title binds purchaser). Thus, production from wells anywhere on the unit is covered by the GPA whether or not those wells are physically located on the committed acreage.

■ Finally, in construing a contract, the court must endeavor to give effect to each provision so that none is rendered meaningless. *Coker v. Coker,* 650 S.W.2d at 393. Tennessee's construction of the GPA would render meaningless the expressed right of the Seller to unitize the leases. This construction cannot prevail. The court below correctly found as a matter of law that Tennessee is obligated to take or pay for gas produced from wells located anywhere on the units.

■ Tennessee next urges that, if it is obligated to take or pay for some portion of the gas produced from wells on the units but not on the committed acreage, that portion should be determined by the delivery capacity of the wells physically located on the committed acreage. We disagree. When leases are unitized, production from a well located anywhere on the unit is deemed to be production from everywhere on the unit. *Southland Royalty Co. v. Humble Oil & Refining Co.*, 151 Tex. 324, 249 S.W.2d 914, 916 (1952). A logical corollary to this rule is that a well drilled anywhere on the unit is deemed to be a well on each lease in the unit. Thus, all wells on the Guerra A and B Units are deemed to be wells on the committed leases subject to the GPA and Seller's delivery capacity may be measured thereby.

The leases, incorporated into the GPA as noted above, provide that allocation of gas

---

**11.** Paragraph 10 states in its entirety: *"Exhibits:* Exhibits 'A,' 'B' and 'C' and the provisions there-

in shall constitute parts of this Agreement." Exhibits A, B, and C are the underlying leases.

production in the event of unitization will be on a surface acreage basis. *See also Roberts v. Lone Star Producing Co.*, 369 S.W.2d 373, 377 (Tex.Civ.App.—Eastland 1963, no writ) (in absence of agreement to contrary, allocation of production is in proportion to acreage). It is undisputed that the leases subject to the GPA encompass 50% of the surface acreage in the Guerra A and B Units. It is similarly undisputed that Tennessee is obligated to take or pay for 85% of the Seller's delivery capacity. As noted above, delivery capacity is properly measured from wells on the unit but off the committed acreage. Thus, the court did not err in concluding that Tennessee is obligated to take or pay for 50% of 85% of Seller's delivery capacity from wells located on the Guerra A and B Units.[12]

Points of error six and seven are overruled.

## VI. DTPA CLAIMS

■ In point of error eight, which Tennessee urges only against appellee Lenape, Tennessee contends that the court erred in granting summary judgment that its DTPA claims are contract claims not cognizable under the DTPA.

In its second amended original petition, Tennessee alleged that Lenape[13] violated section 17.50(a)(1) of the DTPA by (1) causing confusion or misunderstanding as to the source of gas to be produced from Guerra Well No. 1; (2) using deceptive representations or designations of geographic origin in connection with the reserves subject to the GPA; (3) representing that the gas to be produced from Guerra Well No. 1 has characteristics it does not have (that the gas will be produced from reserves committed to the GPA through valid leases); and (4) representing that the GPA confers or involves rights, remedies, or obligations it does not have or involve (that the GPA obligates Tennessee to purchase all or part of the gas

produced from Guerra Well No. 1). Tennessee also alleged that Lenape violated section 17.50(a)(3) of the DTPA by engaging in unconscionable action including scheming to settle the lawsuit concerning termination of the Fantina Yzaguirre leases so as to exploit the GPA, bad faith pooling, and an unconscionable attempt to significantly increase the amount of gas tendered to Tennessee.

Lenape moved for summary judgment on the ground that Tennessee's DTPA claims do not constitute independent tort claims but are merely breach of contract claims not cognizable under the DTPA.

■ Whether pleadings fail to state a cause of action may not be resolved by summary judgment. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983).

> [T]he protective features of special exception procedure should not be circumvented by a motion for summary judgment on the pleadings where plaintiff's pleadings, . . ., fail to state a cause of action.

*Texas Dep't of Corrections v. Herring*, 513 S.W.2d 6, 10 (Tex.1974). Only after the plaintiff has been given an opportunity to amend after special exceptions are sustained may a summary judgment or dismissal for failure to state a cause of action be granted. *Id.*

■ Lenape asserts that it was not necessary to file special exceptions because the petition affirmatively demonstrates that no cause of action exists, *see Texas Dep't of Corrections v. Herring*, 513 S.W.2d at 9, and that the defect could not be cured by amendment, *see James v. Hitchcock Indep. Sch. Dist.*, 742 S.W.2d 701, 704 (Tex.App.—Houston [1st Dist.] 1987, writ denied). We disagree. The facts alleged in the petition do not affirmatively show that Tennessee has no cause of action under the DTPA. We recognize that a mere allegation of breach of contract, *without more*, will not support a DTPA claim. *See Ashford Dev., Inc. v. USLife Real*

---

**12.** Although this issue is determined as a matter of law, we also note that Charles Faulk, who negotiated the GPA for Tennessee, specifically testified that the GPA language provision on unitizing means that the Seller's interest in the committed reserves is determined by the percentage of surface acreage in the unit. This interpre-

tation of the contract is consistent with the court's holding.

**13.** The petition contains allegations of DTPA violations against Lenape, Tesoro, and Coastal, but Tennessee has abandoned its DTPA claims against Tesoro and Coastal on appeal.

*Estate Serv. Corp.,* 661 S.W.2d 933, 935 (Tex. 1983). Whether Tennessee failed to allege "more" than breach of contract is not an affirmative showing that "more" does not exist and could not be pleaded. We cannot say that Tennessee could not have demonstrated in response to special exceptions that its claims extended beyond a mere breach of contract.

The court erred in granting the summary judgment on Tennessee's DTPA claims without first affording Tennessee an opportunity to amend its pleadings. Point of error eight is sustained.

## VII.  ATTORNEY'S FEES

■ In point ten, Tennessee contends that the court erred in awarding appellees' attorney's fees. Because we must reverse the judgment and remand this cause in part, we also reverse the award of attorney's fees and remand that issue to the trial court. Gulf urges that it should be entitled to its attorney's fees in any event because it prevailed on that portion of its declaratory judgment action seeking a declaration that gas produced from the units and attributable to the committed reserves is committed also to the Gas Measurement Agreement and the Gas Transportation Agreement. Tennessee has not challenged those declarations on appeal. Nonetheless, Gulf was an adverse party to Tennessee in relation to the issues upon which we have reversed. Like the other appellees, it has prevailed upon some issues but may not prevail upon those issues which have been remanded. The trial court may properly determine each parties' entitlement to attorney's fees once all of the issues are resolved and it may be determined who is a "prevailing party." Point of error ten is sustained.

Having disposed of each of Tennessee's points on appeal, we now address the cross-points raised by Lenape.

## VIII.  CLAIM FOR FARMOUT DAMAGES

■ In its third cross-point of error, Lenape contends that the court erred in finding that its claim for farmout damages was barred by the business and commerce code. Lenape entered a farmout agreement in 1989. It alleged that because of Tennessee's breaches of the GPA, it obtained less favorable terms and conditions in negotiating this farmout and, therefore, suffered a loss of substantial value and revenues.

Lenape first urges that its claim for farmout damages is not barred by the UCC because of section 2.701, which states that "[r]emedies for breach of any obligation or promise collateral or ancillary to a contract for sale are not impaired by the provisions of this chapter." Tex.Bus. & Com.Code Ann. § 2.701 (Vernon 1968). This section is inapposite to the issue at hand. Lenape does not contend that Tennessee breached a collateral *obligation or promise.* The collateral contract here at issue is the farmout agreement; Tennessee is not a party to that agreement and could not breach it. Rather, what Lenape complains of is that Tennessee breached the GPA, which breach adversely affected its rights under the collateral contract. This presents an issue of collateral *damages,* not breach of a collateral *promise.* Section 2.701 applies only to the latter.[14]

■ Lenape also argues that its farmout damages were recoverable under UCC section 2.706, which provides for resale of goods and recovery of the difference between the resale price and the contract price. Tex.Bus. & Com.Code Ann. § 2.706 (Vernon 1968). This section is also inapposite. The goods which are the subject of the GPA are quantities of gas. This gas was not resold under the farmout agreement. Rather, that agreement conveyed an interest in land. *See Lockhart v. Williams,* 144 Tex. 553, 192 S.W.2d 146, 148 (Tex.1946). Even if the farmout interest were considered "goods," it is not the same goods as covered by the

14. For an example of the type of situation contemplated by section 2.701, see *O'Neill v. Steppat,* 270 N.W.2d 375 (S.D.1978). Lenape cites this case as support for its position, but it is clearly distinguishable. *O'Neill* involved a suit on a note given in connection with a contract for the sale of goods. This suit involved a collateral *promise*—the promise to pay on the note—and properly fell within the ambit of section 2.701.

GPA, so it cannot be said that Lenape "resold" any goods that Tennessee refused to purchase. Section 2.706 simply has no application.

▪ Lenape also urges that it is entitled to recovery for farmout damages under UCC section 2.708. That section states that the seller's measure of damages for non-acceptance of goods is (a) the difference between the market price and the unpaid contract price (together with incidental damages but less expenses saved) or (b) if the first measure of damages is inadequate, the profit which the seller would have made from full performance by the buyer. TEX.BUS. & COM. CODE ANN. § 2.708 (Vernon Supp.1993). Lenape asserts that the first provision is inadequate and that it is entitled to the profit it would have made had Tennessee fully performed the contract. Even accepting this contention, Lenape is not entitled to the alleged farmout damages.

▪ Section 1.106 of the UCC states that an aggrieved party should be put in as good a position as if the other party had fully performed, but consequential damages may not be had unless otherwise specifically provided. TEX.BUS. & COM.CODE ANN. § 1.106(a) (Vernon 1968). The UCC specifically provides that an aggrieved *buyer* may recover incidental and consequential damages. TEX. BUS. & COM.CODE ANN. §§ 2.714(c), 2.715(b) (Vernon 1968). There is no provision, however, for an aggrieved *seller* to recover consequential damages. *See* TEX.BUS. & COM. CODE ANN. §§ 2.709, 2.710 (Vernon 1968) (seller's incidental damages); *see also USX Corp. v. Union Pacific Resources Co.,* 753 S.W.2d 845, 856 (Tex.App.—Fort Worth 1988, no writ) (jury instructed not to include consequential damages in damage award). The UCC does not provide for recovery by a seller of consequential damages. *Gray v. West,* 608 S.W.2d 771, 781 n. 3 (Tex.Civ. App.—Amarillo 1980, writ ref'd n.r.e.); *Nobs Chem., U.S.A., Inc. v. Koppers Co., Inc.,* 616 F.2d 212, 216 (5th Cir.1980). Consequential damages have been defined as those damages "which do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties which were an approximate result of the breach." *USX Corp. v. Union Pacific Resources Co.,* 753 S.W.2d at 856 n. 5. The profit Lenape would have made *from the GPA* is the money it would have received had Tennessee paid the full contract price for all of the gas tendered. A greater interest in a farmout agreement with a third party is not within the immediate transaction between Tennessee and Lenape; it is consequential to that agreement. *See USX Corp.,* 753 S.W.2d at 856 n. 5. These damages are not recoverable under the UCC.

In summary, the GPA is governed by the UCC, the UCC does not provide for consequential damages to a seller, and the farmout damages sought by Lenape are consequential damages. The court did not err in finding that the claim for farmout damages is barred by the business and commerce code. Cross-point of error three is overruled. Because of our disposition of cross-point three, we need not address cross-points of error one and two.

## IX. ANTICIPATORY REPUDIATION

▪ In cross-point of error four, Lenape contends that the court erred in granting summary judgment denying its claim for anticipatory repudiation. Lenape asserts that Tennessee repudiated the contract by virtue of its Emergency Gas Purchase Policy, use of a force majeure provision, failing to pay full price for gas under the GPA, and seeking a declaration that the Fantina Yzaguirre leases were terminated. Lenape further urges that Tennessee's conduct constituted a continuing repudiation that accrued each month when a payment was due under the GPA and Tennessee failed to make full payment.

▪ Lenape has failed to distinguish an action for mere breach of contract from an action for anticipatory repudiation. A breach of contract occurs when a party fails or refuses to do something that it has promised to do. *Townewest Homeowners Ass'n, Inc. v. Warner Communication Inc.,* 826 S.W.2d 638, 640 (Tex.App.—Houston [14th Dist.] 1992, no writ). When the contract calls for periodic payments, a cause of action for nonpayment accrues at the end of each

period until the contract is complete. *Id.* Therefore, the limitations period begins to run as to each payment on the date it is due and not paid. *Id.* Lenape had a right to pursue its claims for breach of contract for underpayment for the four years prior to the filing of its counterclaim. Indeed, Lenape was permitted to pursue and recover on those claims. Underpayment for each contract period does not, however, constitute anticipatory repudiation.

■ Anticipatory repudiation applies only when a party repudiates the contract before time for performance. *Admiral Motor Hotel v. Community Inns,* 389 S.W.2d 694, 700 (Tex.Civ.App.—Tyler 1965, no writ). The refusal to perform must be unconditional and the renunciation of the contract must be complete. *Id.; see also Ennis Business Forms, Inc. v. Gehrig,* 534 S.W.2d 183, 189 (Tex.Civ.App.—Waco 1976, writ ref'd n.r.e.) (unequivocal renunciation). The repudiating party must clearly show a fixed intention not to comply with the terms of the contract in the future. *Ennis Business Forms, Inc. v. Gehrig,* 534 S.W.2d at 189; *see also McKenzie v. Farr,* 541 S.W.2d 879, 881 (Tex.Civ.App.—Beaumont 1976, writ ref'd n.r.e.) (unconditional declaration of intent not to perform in future).

■ When a vendee repudiates a contract, the vendor is entitled to an immediate rescission of the contract. *Griffith v. Porter,* 817 S.W.2d 131, 135 (Tex.App.—Tyler 1991, no writ). Notice of intent not to perform under a contract, however, does not of itself constitute an automatic rescission. *Id.* If the repudiation is not accepted by the other party, the contract remains in effect for the benefit of both parties. *Id.*

> An anticipatory breach of contract occurs prior to the time of performance and *must be accepted or acted on* by the other party. The renunciation of the contract merely gives the innocent party to the contract the *option* to also consider the agreement to be at an end and to then act accordingly.

*Townewest Homeowners Ass'n, Inc. v. Warner Communication Inc.,* 826 S.W.2d at 640 (emphasis added; citation omitted). "[T]he non-repudiating party must either rescind or retain his former rights under the contract;

he may not do both." *Griffith v. Porter,* 817 S.W.2d at 135.

The record is clear in the present case that Lenape is complaining of a series of breaches of contract for failure to pay the full contract price. It is equally clear that the GPA itself has not been rescinded. While there may be some issue of fact concerning whether certain acts taken by Tennessee constituted a repudiation by Tennessee, it is established as a matter of law that Lenape did not accept that repudiation. Rather, Lenape continues to tender gas to Tennessee and continues to insist that the GPA remains in effect. Lenape cannot both treat the contract as remaining in effect and also contend that it has been rescinded. *See Griffith v. Porter,* 817 S.W.2d at 135. Having treated the contract as remaining in effect, its remedy is an action for breach of contract for past underpayments. As noted above, that remedy was not denied.

Tennessee demonstrated as a matter of law that Lenape has no cause of action for anticipatory repudiation. The court did not err in granting the summary judgment. Cross-point of error four is overruled.

## X. DURESS AND COERCION

■ In cross-point of error five, Lenape contends that the court erred in granting summary judgment denying its claim for duress and coercion. Lenape alleged that an Emergency Gas Purchase Policy letter, a compliance letter, and a force majeure letter sent by Tennessee contained threats to do acts which Tennessee had no legal right to do and that this constituted duress and coercion.

■ In order to recover for duress or coercion, Lenape would have to prove (1) that Tennessee threatened to do some act which it had no legal right to do; (2) that the threat was of such a character as to destroy Lenape's free agency; (3) that the threat overcame Lenape's free will and caused it to do that which it would not otherwise have done and which it was not legally bound to do; (4) that the restraint was imminent; and (5) that Lenape had no present means of protection. *See Creative Mfg., Inc. v. Unik, Inc.,* 726 S.W.2d 207, 211 (Tex.App.—Fort

**304**

Worth 1987, writ ref'd n.r.e.); *First Texas Sav. Ass'n v. Dicker Ctr., Inc.,* 631 S.W.2d 179, 184–85 (Tex.App.—Tyler 1982, no writ).

While we may accept the contention that Tennessee threatened to do acts that it had no legal right to do, Tennessee conclusively negated that the threats were such as to destroy Lenape's free agency and that Lenape had no present means of protection. Tennessee affirmatively demonstrated that Lenape recognized as early as 1983 that it could file suit against Tennessee for breach of the GPA, but that it made a business decision "to let the big boys fight that battle" rather than to file suit. Lenape submitted the affidavit of C.R. Devine as controverting proof, but that affidavit merely states in conclusory terms that Lenape's free will was overcome and that it had no adequate means of protection. Such conclusions are insufficient to raise an issue of fact. *Mercer v. Daoran Corp.,* 676 S.W.2d 580, 583 (Tex. 1984); *Life Ins. Co. of Virginia v. Gar–Dal, Inc.,* 570 S.W.2d 378, 381–82 (Tex.1978).

Because Tennessee negated as a matter of law at least one of the elements of Lenape's cause of action, the court did not err in granting the summary judgment. Cross-point of error five is overruled.

### XI. TORTIOUS INTERFERENCE WITH CONTRACT

In cross-point of error six, Lenape contends that the court erred in granting summary judgment denying its claim of tortious interference with contract. Lenape alleged that Tennessee interfered with its lease contracts by filing the present lawsuit.

The proper exercise of a legal right cannot constitute a legal wrong for which a cause of action will lie. *Ryan v. Laurel,* 809 S.W.2d 258, 261 (Tex.App.—San Antonio 1991, no writ). Bringing suit to determine one's rights under a contract is a proper exercise of a legal right and cannot form the basis for a claim of tortious interference. *See id.* Tennessee demonstrated legal justification as a matter of law. *See id.* The court did not err in granting the summary judgment. Cross-point of error six is overruled.

### XII. CONCLUSION

The judgment is reversed insofar as it (1) grants summary judgment that the Gas Purchase Agreement is not an output contract governed by section 2.306 of the Uniform Commercial Code; (2) grants summary judgment that Tennessee's DTPA claims against Lenape are not cognizable under the DTPA; (3) awards appellees all certificates of deposit and other funds held in escrow; and (4) awards attorney's fees to appellees. In all other respects, the judgment is affirmed. Costs of appeal are assessed one-third against appellant and two-thirds against appellees.